Madeleine E. MORIN

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES.**

Civ. No. 91–316–D.

United States District Court,
D. New Hampshire.

April 10, 1992.

Elizabeth R. Jones, Manchester, NH, for plaintiff.

Elaine Marzetta Lacy, Asst. U.S. Atty., Concord, NH, for defendant.

## ORDER

DEVINE, Chief Judge.

In this action, claimant Madeleine E. Morin seeks review of a final determination of

the Secretary of Health and Human Services ("Secretary") denying her application for Social Security disability benefits. Jurisdiction is alleged under 42 U.S.C. § 405(g). Currently before the court are claimant's motion to reverse the decision of the Secretary and defendant's motion for an order affirming the decision of the Secretary.

## I. Background

Canadian-born claimant was 62 years of age at the time of her latest hearing before an Administrative Law Judge ("ALJ"). Transcript (hereinafter "Tr.") 33, 75. She resides in Manchester, New Hampshire, with her husband and their two children. Claimant completed only four grades in school, leaving at the age of thirteen. Tr. 33–34. Although she took some night classes to learn basic English language skills after immigrating to the United States in 1979, Tr. 34, 56, French remains her primary language. Tr. 53, 82. She neither speaks nor reads English very well, Tr. 34–35, 163, and she remains unable to write in English. Tr. 35. Claimant is right-handed, Tr. 56.

Claimant, the mother of eight children (two of her own and six adopted), Tr. 131, 136, was essentially healthy, asymptomatic, and working full time until September 2, 1982, when she slipped and fell on some oil in a parking lot, landed on her buttocks, and injured her spine. Tr. 9, 29, 41, 144, 155, 228. For all practical purposes, she has not been employed since that time, although she did attempt a home craft activity, making bows, in an effort to become self employed from 1986 to 1988. Tr. 10, 41–42, 65.

Claimant's work history reveals a variety of unskilled entry-level positions. Tr. 65. Immediately prior to her accident, she was a sewing machine operator in a variety of clothing and shoe shops. Tr. 11, 37, 39, 64. These jobs were held during a seven-month period in 1982. Tr. 37. Prior to that she worked almost three years, 1979 to 1982, gluing features onto animal faces on slippers. Tr. 38. From 1975 to 1978 claimant held a position that required her to feed material

into a machine. Tr. 38, 64–65. Claimant met the disability insured status requirements of the Social Security Act on September 2, 1982, and thereafter until her insured status for disability benefits expired on June 30, 1990. Tr. 9, 12.

In the instant action, claimant seeks to be found disabled from 1982 through the present because she continues to suffer from mid and lower back pain; inability to sit or stand for more than fifteen minutes; frequent falls, the apparent result of numbness in her legs; problems with numbness of her right arm, hand, and shoulder; and headaches. Tr. 42–50. These symptoms are alleged to exist as the result of the spinal injuries she suffered when she fell in 1982.

### A. Medical Evidence [1]

At the time of her accident, claimant was a patient of Ronald Gagne, M.D., her family practice physician. Tr. 120, 224. Since her injury, she has been evaluated and treated by a multitude of other medical professionals as well. Immediately following her accident, claimant was hospitalized for six days and treated for low back pain. Tr. 46, 155, 191. One month later, because she continued to have low back pain for which physical therapy treatment was not helping, Dr. Gagne referred her to James Frenette, M.D., an orthopedic surgeon. Tr. 154, 225, 228.

Dr. Frenette evaluated claimant on October 21, 1982, with the resulting diagnostic impression of degenerative arthritis of the spine and back strain. Tr. 149. By February 1983 Dr. Frenette noted that, while Mrs. Morin had improved, the physical therapy had reached its maximum benefit but she nevertheless continued to have residual symptoms. Tr. 152, 228. He also stated that piecework was a problem and that she should look for an easier job. Id. In April of 1983, Dr. Frenette noted that Mrs. Morin's lower back pain and right leg pain were still intermittent. Tr. 153. Wanting to rule out a ruptured disc, he referred her to Garrett Gillespie, M.D., a specialist in neurologi-

---

1. To the extent that evidence from a prior denial (June 27, 1984) is referred to, it is for the limited purpose of "reviewing the preliminary facts or cumulative medical history...." *Frustaglia v. Secretary of Health and Human Services,* 829 F.2d 192, 193 (1st Cir.1987) (citations omitted).

cal surgery, for further evaluation. Tr. 153, 162.

In his April 26, 1983, report, Dr. Gillespie noted that after the initial improvement experienced by Mrs. Morin with her physical therapy treatment, her condition then worsened. She had persistent pain across the low back, radiating up to the mid-back region, with pain at times down to the right knee. Tr. 155. At times she got a feeling of numbness in the right foot. *Id.* He observed that she was in a "great deal of obvious discomfort". *Id.* Dr. Gillespie's diagnosis was spinal injury of September 2, 1982, with (1) compression fracture of T12 vertebra and (2) probable ruptured lumbar disc. Tr. 156. Dr. Gillespie attributed Mrs. Morin's persistent symptomatology to her spinal injury. *Id.*

Because of the ruptured disc, Mrs. Morin underwent surgery at Catholic Medical Center for a lumbar laminectomy in May 1983. Tr. 157. Mrs. Morin represents that the surgery helped make her lower back better, but that she still suffered from pain. Tr. 47. Dr. Gillespie, while also thinking that claimant was better than she was pre-operatively, noted in May 1983 that Mrs. Morin remained disabled from any sort of occupational activity as a result of her fall. *Id.* In July 1983, Dr. Gillespie noted that claimant still had some residual symptomatology, although he thought that by autumn she might start back to a light structured job. Tr. 158. During a follow-up evaluation in September 1983, Dr. Gillespie noted that Mrs. Morin had attempted to return to work as a stitcher, but her employer would not hire her. Tr. 159. Additionally, because she had some residual back pain, her employer would not make light work available to her. *Id.* Dr. Gillespie's medical opinion was that he "certainly [didn't] see anyone hiring her after her injury with her obvious limitations." *Id.* His recommendation was for "indefinite limited activity". *Id.* After another follow-up examination in December 1983, Dr. Gillespie again documented Mrs. Morin's "intermittent symptomatology referable to her fall." Tr. 160. His opinion at that time was that she could "never ... return to work as a stitcher." *Id.* While noting that Mrs. Morin

"might consider some part-time work if she so chooses" by spring, he "doubt[ed] anyone would hire her in her age and physical handicaps." *Id.*

In June of 1984, James Shea, M.D., an orthopedic surgeon consulting for the Social Security Administration (SSA), evaluated Mrs. Morin in conjunction with her first application for disability benefits. Tr. 147, 163. Claimant complained at that time of persistent back pain which was aggravated by any bending or lifting and any attempts to do any housework or vigorous physical activity. Tr. 163. That pain seemed to radiate down to her left leg. *Id.* While Dr. Shea observed her to ambulate with ease, she could only flex the thoraco-lumbar spine with hesitation. Tr. 164. Percussion of the spine resulted in severe discomfort around the mid and lower thoracic area and in the area of her lumber incision. *Id.* Dr. Shea noted normal strength and a full range of motion of the joints in both lower extremities. *Id.* However, he also indicated that there was x-ray evidence of osteoporosis of the thoraco-lumbar spine, as well as x-ray and bone scan evidence of the compression fracture of the 12th thoracic vertebra. Tr. 164–65. Dr. Shea's diagnoses included low back pain syndrome, status post lumber laminectomy with excision of herniated L3–4 disc on the right. Tr. 165.

In November 1984, Dennis Wachs, M.D., an orthopedic surgeon, Tr. 220, completed an independent medical evaluation of Mrs. Morin. Tr. 228. Dr. Wachs documented her complaints at that time as back pain involving practically her entire spine, including the thoracic, cervical, and lumbar spine; numbness or a feeling of numbness in her right arm and hand; frequent headaches; and neck tension. Tr. 229. Claimant represented to Dr. Wachs that she could not do her housework, could not sit for more than an hour at a time, could not walk for more than a half mile, and could not stand in one place for more than half an hour. She found that lying down on her side with her knees bent helped her discomfort, and that sitting in a straight or easy chair or bending forward to brush her teeth made the pain worse. Claimant expressed interest in returning to

work, but was pessimistic because she could not even do her housework. *Id.*

Dr. Wachs' physical examination revealed "tenderness to palpitation over her mid cervical spine, particularly her entire thoracic spine, her upper lumbar spine and her sacroiliac joints, left more than right." *Id.* The range of motion of her lumbar spine was only one-half to two-thirds of normal, straight leg raising was negative to about 80 degrees, and sensation in her left leg was slightly diminished. *Id.* X-rays revealed wide-spread minimal degenerative osteoarthritic-type [2] changes, the healed T12 compression fracture, and definite osteoporosis throughout the entire spine. Tr. 230.

Further medical evidence for the period 1984–1987 is largely missing from the record, apparently as a result of SSA's losing or misplacing claimant's second application for disability benefits filed in 1987. Tr. 31–32, 218.

In 1987, the record reveals that Dr. Gagne, Mrs. Morin's family practice physician, was still diagnosing chronic low back problems. Tr. 116. His notation in June 1987 indicates only that her condition was "stable".[3]

In November 1987, Dr. Shea, again as a consulting examiner for SSA, re-evaluated Mrs. Morin. Tr. 231. His report, which is about all that remains of the 1987 application, indicates that

> [s]he continues to have a lot of back pain which radiates down to her right leg at this time. Her symptoms are made worse by bending or lifting and relieved by lying down. She also has numbness down her right leg....
>
> Frequently in the past her symptoms were predominantly in her left leg. Her left leg gave out on her about 6 months

ago and she had a sprain of her left ankle which recovered.

*Id.* While Dr. Shea found no limitation of range of motion in either her cervical or thoraco-lumbar spine in a standing position, he did note her complaints of discomfort when flexing the latter. *Id.* Also, on physical examination, percussion of the spine over the thoraco-lumbar junction and lower lumbar vertebral levels produced discomfort of a moderate degree. Tr. 232. His diagnoses at that time were (1) healed compression fracture of the twelfth thoracic vertebra, (2) spinal osteoporosis, and (3) lumbar radicular syndrome, status post laminectomy with excision of right L3–4 disc herniation. *Id.*

Still suffering from mid to lower back pain, Mrs. Morin was treated by Joseph Horan, D.C., a chiropractor, in December of 1988. Tr. 127–30. He noted that she had leg pain and that her back was "painful all the time." Tr. 128. During May and June of 1989, Mrs. Morin was evaluated and treated by Monique Larouche, M.D., for complaints of chronic back pain, ear pain, sore throat, fatigue, and nervousness. Tr. 52, 136. Dr. Larouche documented Mrs. Morin's frequent headaches as well as her lower back pain, the latter making it difficult for her to get up from her sitting position in a chair. Tr. 136–37. Dr. Larouche apparently prescribed the drug Feldene [4] at that time.

In August 1989, in conjunction with Mrs. Morin's third and current application for disability benefits, Dr. Shea again evaluated her for the SSA. Tr. 144. Dr. Shea's 1989 review reveals some changes suggesting a worsening of Mrs. Morin's condition since his 1987 consultation. *Cf.* Tr. 231. For instance, in 1987 Mrs. Morin had back pain which radiated down to her right leg. *Id.* By August 1989, that back pain radiated down

**2.** Osteoarthritis is a noninflammatory degenerative joint disease which is accompanied by pain and stiffness. *Dorland's Illustrated Medical Dictionary* 1197 (27th ed. 1988). Dr. Wachs concluded that while claimant's osteoarthritis was not in and of itself related to her fall, it could have been made more symptomatic as a result of her slip-and-fall-type injury. Tr. 230.

**3.** As used in a medical context, "stable" means fixed or resistant to change. *Dorland's Medical Dictionary* at 1571.

**4.** Feldene is a nonsteroidal anti-inflammatory drug which is indicated for acute or long-term use to relieve signs and symptoms of osteoarthritis and rheumatoid arthritis. *Physicians' Desk Reference* 1777 (46th ed. 1992). Gastrointestinal symptoms are the most prominent side effects of Feldene, *id.* at 1778, and apparently caused Mrs. Morin to discontinue the medication. Tr. 53, 58–59, 61.

both legs, with the pain going down to her calves. Tr. 144. In 1987 Dr. Shea noted a numbness down Mrs. Morin's right leg. Tr. 231. In 1989, he documented paresthesia[5] down into both feet. Tr. 144. The 1987 report noted that her symptoms were made worse by bending or lifting. Tr. 231. The more recent documentation noted more generally that "physical activity" aggravated her back and leg symptoms. Tr. 144. Additionally, the 1987 report indicated that her lower extremity symptoms were predominantly in her left leg. Tr. 231. By 1989 Mrs. Morin felt her right leg was getting worse. Tr. 144. Dr. Shea's 1989 physical examination revealed continued tenderness of moderate degree over the lower thoracic and entire lumbar spine upon percussion of the spine. Tr. 145. It also revealed a decrease in Mrs. Morin's ability to flex her thoraco-lumbar spine. In 1987 she could flex in a standing position to 90 degrees with discomfort. Tr. 231. By 1989 she could only do so to sixty degrees "with great hesitation." Tr. 145. Moreover, the x-ray evidence of the lumbar spine considered on these two consultations reveals that in 1989 Dr. Shea additionally documented findings of "minimal degenerative spondylosis."[6] *Id.*

In December of 1989, a nonexamining medical consultant for SSA, Homer Lawrence, M.D., documented Mrs. Morin's diagnosis as chronic low back pain with x-ray evidence of modest degenerative changes in the lumbosacral spine. Tr. 105. Also in December of 1989, Mrs. Morin was treated by Edwin Bell, D.O., for her back and hip pain. Tr. 52, 111, 223. Focusing also on her "recurrent and consistent headaches," Dr. Bell's diagnosis was of cervical and dorsal strain. *Id.* Dr. Bell's conclusion was that Mrs. Morin's condition was unresponsive to his manipulative treatment. Tr. 223. In May of 1990, he considered the prognosis poor and did not know of any treatment to which this condition will respond. *Id.* Mrs. Morin represents that the manipulative

treatment provided some measure of symptomatic relief; however, she apparently discontinued it because she could not afford it. Tr. 52.

### B. Procedural History

Mrs. Morin filed her first application for disability insurance benefits on April 27, 1984, which was denied on July 27, 1984. Claimant's second application, the subject of the missing record, was filed on September 19, 1987, and was apparently denied in September 1988. Tr. 85. There is no evidence to suggest that a request for reconsideration was ever filed with regard to either of these prior applications. However, claimant did request that the ALJ reopen both of them. Tr. 9, 30–31.

Mrs. Morin's current application for disability insurance benefits was filed on July 29, 1989. Her application was denied initially on August 23, 1989, and then later on reconsideration on December 18, 1989. Claimant the requested and received a hearing before Administrative Law Judge ("ALJ") Henry Milne, who subsequently died. Therefore, on October 22, 1990, a second *de novo* hearing was held before ALJ Robert Klingebiel, who issued a written decision on November 27, 1990.

In his decision, the ALJ applied the five-step sequential evaluation analysis prescribed by 20 C.F.R. § 404.1520 (1991). *See Ortiz v. Secretary,* 890 F.2d 520, 522 (1st Cir.1989). The ALJ found that: at Step 1, claimant has not engaged in substantial gainful activity since September 2, 1982; at Step 2, claimant has severe osteoporosis of the lumbosacral spine, status post lumbar laminectomy, and compression fracture at T 12; and at Step 3, claimant does not have an impairment or combination of impairments listed in or medically equal to one listed in the Secretary's Listing of Impairments. *See* Appendix 1 to 20 C.F.R. Part 404, Subpart P. The ALJ then found that claimant "has the

---

**5.** A paresthesia is an abnormal sensation such as a burning or prickling sensation. *Dorland's Medical Dictionary* at 1232.

**6.** Lumbar spondylosis is a "degenerative joint disease affecting the lumbar vertebrae and inter-

vertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure by associated protruding disks." *Dorland's Medical Dictionary* at 1567.

residual functional capacity [RFC] to perform work-related activities except for work involving lifting and/or carrying more than 20 pounds at a time." Tr. 12. At Step 4, the ALJ found that claimant's impairments do not prevent her from performing her past relevant work as a clothing stitcher. *Id.* Accordingly, the ALJ determined that claimant was not under a "disability" as defined in the Act at any time through June 30, 1990. Tr. 12. Subsequently, the Appeals Council denied claimant's request for a review, making the ALJ's decision the final decision of the Secretary. Tr. 4.

The ALJ's decision and the record, when viewed as a whole, are ambiguous as to whether, in the alternative, Step 5 in the sequential analysis was reached. The ALJ made no explicit finding that claimant could do other work, given her RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(f). However, there is evidence that these relevant Step 5 factors were considered. For example, the regulations indicate that if a claimant has the RFC to do past relevant work, a finding of not disabled will be made without considering the vocational factors of age, education, and work experience. 20 C.F.R. § 404.1560(b). However, the ALJ in making his RFC finding cited to section 1565, an indication that he considered claimant's work experience, a Step 5 vocational factor. Tr. 12. Furthermore, during the hearing, the ALJ explained to the vocational expert that his hypothetical question would "vary with not only the limitations but with age categories as well, because we do have a situation here where we have age that spans in several categories that are set out in the Social Security regulations." Tr. 65. The ALJ also explained that the vocational expert was

> going to testify about the types of jobs that you've performed in the past and also whether you may be equipped to do other types of work taking into account a number of things: your age, your education, past work experience that you've had and your other limitations that you have as well. And he would also testify as to

whether such jobs would exist in the national economy and also in the region where you live.

Tr. 62. Moreover, the Secretary argues, apparently in the alternative, that under the Social Security regulations, a person is not disabled if her RFC and vocational abilities make it possible to do work which exists in the national economy, citing 20 C.F.R. § 404.1566(c). The Secretary further argues that the vocational expert's testimony was that all of the types of work plaintiff had performed in the past exist in significant numbers in the national economy, citing the hearing transcript at 66.[7] While the court finds this reasoning to be confusing, it is also indicative that factors relevant to Step 5 were considered.

Claimant does not take issue with the ALJ's determination at Step 3 of the sequential analysis. However, she contends that the ALJ's findings at Steps 4 and 5 of the prescribed sequential analysis are not supported by substantial evidence. Claimant argues that she proved she could not return to her past work and that the Secretary failed to prove with vocational testimony that jobs exist in significant numbers in the national economy which she can perform. Claimant concedes that the ALJ is free, in the alternative, to rely upon rules found at 20 C.F.R. Part 404, Subpart P, App. 2 ("the Grid"), to support a finding that such jobs exist, but argues that, to the extent he used them, he misapplied them. Claimant also challenges the adequacy of the ALJ's reasoning when rejecting her testimony regarding subjective complaints of pain and discomfort. Lastly, claimant contends that the ALJ's failure to reopen past applications is contrary to law.

## II. Discussion

■■■ The Social Security Act empowers this court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

---

7. The Secretary seems to have misconstrued the vocational expert's testimony. The vocational expert never said that jobs existed in *significant* *numbers.* He actually only said claimant "would be able to perform most stitching jobs ... that exist in the local and national economy." Tr. 66.

It further "provides that the factual findings of the Secretary shall be conclusive if supported by 'substantial evidence.'" *Ortiz v. Secretary,* 955 F.2d 765, 769 (1st Cir.1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). It is the Secretary's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence. *Ortiz, supra,* 955 F.2d at 769. The ALJ's credibility determinations are entitled to considerable deference. *Dupuis v. Secretary,* 869 F.2d 622, 623 (1st Cir.1989); *Frustaglia, supra,* 829 F.2d at 195. Nonetheless, in making such determinations, the ALJ is not at liberty to ignore uncontroverted medical reports. *Suarez v. Secretary,* 740 F.2d 1 (1st Cir.1984). Moreover, an ALJ's credibility finding must be supported by substantial evidence and must be accompanied by specific findings as to the relevant evidence he considered in determining to disbelieve the claimant. *Da Rosa v. Secretary,* 803 F.2d 24, 26 (1st Cir.1986) (citing *Benko v. Schweiker,* 551 F.Supp. 698, 704 (D.N.H. 1982)).

■ A claimant's subjective complaints of pain are to be considered if the claimant has "a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." *Id.* 803 F.2d at 25 (citing *Avery v. Secretary,* 797 F.2d 19, 21 (1st Cir.1986)); *see* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; Social Security Ruling ("SSR") 88-13, 1988 WL 236011 at *1

(1988);[8] *Evaluation of Symptoms, Including Pain; Final Rules,* 56 Fed.Reg. 57,928, 57,-941 (1991) (amending, *inter alia,* 20 C.F.R. § 404.1529) (effective Nov. 14, 1991)) (hereinafter, citations will only be to newly amended sections of the C.F.R.). Once a medically determinable impairment is documented, the effects of pain must be considered at each step of the sequential evaluation process. 20 C.F.R. § 404.1529(d). At Steps 4 and 5 of the analysis, an RFC assessment is necessary to determine the effects of claimant's impairment, including additional limitations imposed by pain, on claimant's capacity to perform former work or other work. *See* 20 C.F.R. § 404.1545 (revised at 56 Fed.Reg. 57,928, 57,943). While medical history and objective medical evidence[9] are usually reliable indicators from which to draw reasonable conclusions about the intensity and persistence of pain and its effect on work capacity, it is recognized that situations do exist in which an individual's reported symptoms of pain suggest functional restrictions of a greater degree than can be demonstrated by objective medical evidence alone. *Avery, supra,* 797 F.2d at 23; 20 C.F.R. § 404.-1529(c)(3).

■ Thus, when a claimant indicates that pain is a significant factor limiting his/her ability to work, and that allegation is not fully supported by objective medical evidence in the record, the ALJ is directed to investigate all avenues presented that relate to subjective complaints.[10] *See Avery, supra,* 797 F.2d at 23. A claimant's symptoms, including pain, will be determined to diminish capacity for basic work activities to the ex-

---

8. While SSR 88-13, issued by the Social Security Administration on July 20, 1988, provides guidance for proper evaluation of subjective complaints of pain at each step of the sequential process, this earlier SSA policy is now largely codified at the newly amended 20 C.F.R. § 404.-1529.

9. Objective medical evidence includes evidence of muscle atrophy, reduced joint motion, muscle spasm, and sensory and motor disruption. 20 C.F.R. § 404.1529(c)(2).

10. Specifically, the ALJ must consider information regarding claimant's (1) prior work record, (2) daily activities, (3) location, duration, frequency, and intensity of any pain or other symp-

toms, (4) precipitating and aggravating factors, (5) type dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, past or present, (6) treatment, other than medication, received for relief of pain or other symptoms, past or present, (7) any measures used, past or present, to relieve pain or other symptoms, and (8) other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3). *Cf.* SSR 88-13, *supra,* at *3. *See also Ortiz, supra,* 955 F.2d at 766 (noting Appeals Council remand directing ALJ to consider daily activities described by claimant and his prior work record where objective evidence alone did not support degree of pain alleged by claimant).

tent that the alleged functional limitations and restrictions due to those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4); 42 U.S.C. § 423(d). *See also Avery, supra,* 797 F.2d at 21 (if found credible by adjudicator, such symptoms could permit a finding of disability where medical findings alone would not.)

Reopenings of prior disability determinations are permitted for "good cause", 20 C.F.R. § 404.988(b), if new and material evidence is presented. 20 C.F.R. § 404.-989(a)(1). *Torres v. Secretary,* 845 F.2d 1136, 1138 (1st Cir.1988). Additionally, good cause will be found if evidence used in making a decision clearly shows on its face that an error was made. 20 C.F.R. § 404.-989(a)(3). However, it is well settled that, absent a colorable constitutional claim, a district court does not have jurisdiction to review the Secretary's discretionary decision not to reopen an earlier adjudication. *Torres, supra,* 845 F.2d at 1138 (citing *Califano v. Sanders,* 430 U.S. 99, 107–09, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977)) (and First Circuit citations therein).

It is against this legal backdrop that claimant's arguments and the ALJ's findings are analyzed.

### A. The Reopening Issue

■ As to claimant's first application for benefits and the ALJ's explicit refusal to reopen it, Tr. 9, the court is powerless. Claimant makes no constitutional claim, and thus the court is without subject matter jurisdiction. However, regarding the second application of 1987, the matter is not as straightforward. Claimant contends that the ALJ constructively reopened this application by reviewing the claim on its merits. The court is inclined to agree.

■ Initially, the ALJ expressly stated at the hearing that "her current application is construed to be a request to reopen any denial that was based on the application in 1987." Tr. 31. Second, while the ALJ was explicit and very clear in his refusal to reopen the 1984 application, Tr. 9, he made no specific denial of the request to reopen the 1987 application. Furthermore, when a claim is reconsidered on the merits, it is properly treated as having been reopened as a matter of administrative discretion. *Jelinek v. Heckler,* 764 F.2d 507, 508 (8th Cir. 1985); *see Belanger v. Secretary,* No. 90–490–D, 1991 WL 537146, slip op. at 8 (D.N.H. June 12, 1991). Consequently, the final decision of the Secretary denying such a claim is subject to judicial review to the extent it has been reopened. *Jelinek, supra,* 764 F.2d at 508.

It is entirely permissible for the ALJ to make a threshold inquiry and review the evidence presented by the claimant in order to resolve the reopening issue. *Torres, supra,* 845 F.2d at 1139. However, the record herein supports the conclusion that the ALJ went beyond a proper threshold inquiry. In addition to the lack of any explicit denial regarding reopening the 1987 application, there is substantial evidence that he considered new evidence [11] and that he reached a decision on the merits for the period June 28, 1984, through November 27, 1990. The ALJ's decision itself indicates that the second claim was reconsidered on the merits.

> That determination [of June 27, 1984] therefore remains final and the undersigned does not find disability at any time from September 2, 1982, through June 27, 1984. The claimant's insured status extends through June 30, 1990, but, as discussed below, the record does not show disability at any time through the date of this determination.

Tr. 9. A fair reading of this portion of the ALJ's decision supports the court's conclu-

---

11. Evidence received at the hearing, for example, included a 1982 medical report from Dr. Frenette, Tr. 148, a 1983 medical report from Dr. Gillespie, Tr. 155, a 1984 medical report from Dr. Shea, Tr. 163, claimant's 1990 Recent Medical Treatment form, Tr. 166, Dr. Bell's 1990 letter, Tr. 223, medical notes from Dr. Gagne from Jan. 2, 1981, to June 25, 1987, Tr. 224, Dr.

Wachs' report of November 1984, Tr. 228, and Dr. Shea's 1987 medical report, Tr. 231. At the hearing, the ALJ acknowledged that additional evidence was submitted that morning. Tr. 28 (citing Exhibits 28–33). "It's my proposal to introduce all of these documents into the record and to consider them in deciding [the] case." *Id.*

sion that, *de facto*, the ALJ reopened claimant's 1987 application, rendering it subject to review by this court. *Cf. Torres, supra*, 845 F.2d at 1138–39 (no reopening found where ALJ specifically declined to reopen, he ruled that current claim was barred by administrative res judicata, his decision did not summarize testimony, and he did not discuss the sequential evaluation process).

### B. ALJ's Findings at Step 4 of Sequential Analysis

■ As noted above, the ALJ found that claimant's impairment did not prevent her from returning to past relevant work as a clothing stitcher. Tr. 9, 11. Relying upon the testimony of a vocational expert, the ALJ found the position of clothing stitcher to be "light exertionally" and that claimant retained the RFC to perform light work activities, Tr. 11–12.[12] Usually at Step 4 the claimant is the primary source of vocational documentation, and her statements regarding past work are generally sufficient for determining the skill level and demands of such work. *Santiago v. Secretary*, 944 F.2d 1, 5 (1st Cir.1991) (relying on SSR 82–62). In the instant case, however, the ALJ relied upon the testimony of a vocational expert as well. Tr. 11, 62.

■ To meet her burden at Step 4, claimant is required to make "some reasonable threshold showing that she cannot return to her former employment because of her disability." *Santiago, supra*, 944 F.2d at 5 (citations omitted). To make this showing, claimant must produce evidence of the physical and mental demands of her prior work and then describe those limitations which she says she has, so as to indicate how her current functional capacity precludes the performance of the prior job. *Id.* Claimant testified that her job as a clothing stitcher was performed sitting down and required the use of her arms and both legs. Tr. 39. Regarding her functional limitations, she testified that she cannot sit for more than 15 minutes at a time, Tr. 43, 55, 60, because her back becomes numb, causing her problems

when she gets up. Tr. 44. Additionally, her testimony was that she experienced pain and numbness in her right hand, arm, and shoulder, which at times caused her to drop things, Tr. 48, and that she must lie down daily to provide relief from her back pain. Tr. 54. Claimant also testified that she had trouble lifting items as small as a gallon of milk. Tr. 55–56.

The vocational expert testified that claimant's past sewing machine operation and machine operation work were both considered "light to sedentary" occupations. Tr. 64–65. In response to one of the ALJ's hypothetical questions, the vocational expert testified that if an individual was unable to perform repetitive postural activities and was limited, in terms of being able to sit or stand or walk, to no more than 15 minutes at a time, that individual could not perform "the stitching jobs because it [sic] involves foot operation and sitting primarily." Tr. 66. Additionally, in response to another hypothetical, the vocational expert testified that if an individual had to periodically sit down or recline or lie down for 15 to 30 minutes at least once a day, then that individual would be unable to perform any of those jobs considered to be claimant's past relevant work. Tr. 68.

Central to the ALJ's finding that claimant could return to past work, and thus was not disabled, was his determination that "claimant's testimony regarding her subjective complaints was not credible" and was, in fact, "exaggerative in many respects." Tr. 10. The issue before the court is whether there is substantial evidence in the record to effectively refute claimant's subjective complaints.

It is not disputed that claimant suffers from medically determinable impairments— spondylosis, lumbar radicular syndrome, status post laminectomy, cervical and dorsal strain—that can reasonably be expected to produce pain. *Ortiz v. Secretary, supra*, 890 F.2d at 523; *Avery, supra*, 797 F.2d at 21. And to the extent that the ALJ concluded that claimant's reported symptoms and her

---

**12.** Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. Alternatively, a job is in this category when it involves sitting most of the time, with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.-1567(b).

resulting functional limitations were not adequately demonstrated by objective medical evidence alone, he properly considered other evidence. 20 C.F.R. § 404.1529(c)(3). In so doing, the ALJ's credibility determination seems primarily predicated upon (1) a perception that record evidence does not corroborate many of claimant's symptoms, (2) a perception that if claimant's symptoms were as severe as she alleged, she would have sought treatment, stating that she had not, and (3) a perception that under SSR 88–13 allegations of pain are apparently credible only if prescription pain medication is taken by claimant. Such perceptions lack substantial evidentiary support.

As a threshold matter, in determining the weight to be given to allegations of pain, the First Circuit has clarified that "complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." *Dupuis, supra,* 869 F.2d at 623 (citing *Avery, supra,* 797 F.2d at 21; *Da Rosa, supra,* 803 F.2d at 26).

In discrediting claimant's subjective complaints of right hand, arm, and shoulder pain and numbness, the ALJ stated she "has not sought treatment for these conditions," she did not recently complain of that pain to Dr. Shea (during the 1989 consultative examination), and "the record shows no such complaints to any physician." Tr. 10. These conclusions can only be based upon a erroneous and inaccurate review of the record evidence. The ALJ ignores evidence of claimant's self referral to Dr. Hearne in part because she was experiencing chest discomfort which "occasionally radiates down her arms, causing numbness." Tr. 131. The record also documents her complaints of right shoulder discomfort made to Dr. Barry at the Elliot Hospital, Tr. 126, and complaints of numbness in her right arm and hand made to Dr. Wachs. Tr. 229. Given the nature of her impairments and documentation by at least three physicians, claimant's testimony is far from inherently incredible. Furthermore, to the extent that the ALJ's conclusion as to claimant's upper extremity symptoms is further based upon his assumption that the Act requires that symptoms exist "for a consecutive period of 12 or more months," Tr. 10, he misreads the Act. The twelve-month durational requirement applies only to the impairment itself, not the severity of claimant's symptoms. 42 U.S.C. § 423(d)(1)(A). *Singletary v. Bowen,* 798 F.2d 818, 821 (5th Cir.1986).

Claimant's subjective complaints of headaches and neck stiffness were found by the ALJ not to be credible because "the record does not show significant limitations as the result." Tr. 10. The ALJ based this conclusion upon claimant's alleged ability to do craft work involving "extended neck flexion" for ten hours weekly and to babysit a child in her home without complaints of increased pain, and upon the fact that her only alleged disability due to headache pain is that light housework causes headaches. *Id.* A careful review of the record reveals that claimant's actual testimony regarding the home craft of bow making was that she "tried", but that she had to "change a position every 15 minutes because I couldn't work more than that. It was too hard for my back." Tr. 42. Under further questioning, claimant testified as follows:

Q You couldn't do it that way? Now, you say you only worked on it 15 minutes at a time?

A Oh, yes.

Q How long would you work on it in a week usually?

A Not less than—not more [than] 10 hours because, you know, I have to change the position or change the job, walk around and do something else.

Q Did you usually work 10 hours, or less?

A Less.

Q Did your husband help you with that?

A Oh, yes, a lot because I wouldn't be able to do that alone.

Tr. 43.

With regard to claimant's babysitting activities, claimant's testimony was as follows:

Q Okay, what kind of babysitting did you do?

A I baby sit my granddaughter, but really it wasn't babysitting. It's—because she was at home to help me when my husband wasn't there because very often I fall, you know, (INAUDIBLE) or some stuff like

that and I couldn't move. And she was there to bring me the cordless telephone or to have a chance to call someone for help. She was helping me.

*Id.* Moreover, while claimant testified that she like to read in French, she can only do so for about 15 minutes because "with the pain that I have in my back and my eyes, I can't read too long." Tr. 53. While the ALJ's conclusion is entitled to deference, the substantial evidence herein does not support his conclusion that claimant functioned on those occasions cited without significant limitations. Rather, the evidence supports the opposite conclusion, that claimant was significantly dependent upon others in order to function.

What the court finds most disturbing about the ALJ's credibility determination is the manner in which he trivialized claimant's complaints of pain, whether headaches or back pain. In his decision, the ALJ set forth the following:

> The record shows no medications for headache pain; it is reasonable to believe that if she had such severe headache pain as would contribute to disability she would take medication for it or seek some medical attention which she has not.... Furthermore, pursuant to Social Security Ruling 88–13, the claimant does not require more than aspirin for her allegedly severe back pain. The fact that she does not require more than this for her allegedly limiting back pain does not support her allegations of resultant reduced residual functional capacity.... Although she alleges that her pain is so severe that it interferes with her ability to concentrate this is not given credibility pursuant to Social Security Ruling 88–13 in light of the fact that she has not required more than aspirin for pain relief. Further she testified that she does not take her aspirin medication every day. Similarly her testimony that she has significant side-effects of her medications (Lopid and aspirin) is not credible.

Tr. 10–11.

Initially, the ALJ's clear lack of attention to the record is of great concern to the court.

The ALJ's frequent references to "aspirin" are blatant error.[13] Claimant's frequent testimony was that Tylenol or Extra-strength Tylenol is the medication she uses. Tr. 50–51, 61–62. While perhaps a matter of small distinction to the ALJ, the error becomes glaring in the face of record evidence that claimant is allergic to aspirin—a medical fact well documented in the record. *See* Tr. 52, 122, 131–32, 136, 155. Furthermore, claimant is allergic to penicillin and codeine. *Id.* It mystifies the court, in light of this extremely substantial evidence, how the ALJ was able to brush aside as not credible these significant side-effects. Claimant testified that she uses Extra-strength Tylenol on an as-needed basis, although not always daily. Tr. 61–112. She clarified, however, that her lack of daily use was not an indication of less pain. For example,

> Q Do you take it every day?
>
> A Oh, no. No, because I don't want to be ... no. How you say that?
>
> Q Problems.
>
> A No, because after a while its won't help me at all.

Tr. 61.

The ALJ found claimant's complaints of headache pain causing a severe nonexertional limitation not to be credible. His analysis, however, is based upon his apparent assumption that SSR 88–13 requires a finding that a claimant must be taking narcotic pain medication in order to be found credible. The court is unable to construe the phrase "of *any* pain medication" in such a manner. SSR 88–13, *supra* at *3 (emphasis added). Furthermore, the amended regulation, 20 C.F.R. § 404.1529(c)(3)(iv), is more broadly written to require consideration of the "effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms." Additionally, the court reads the regulation as containing a list of relevant factors to consider, only one of which involves medication. 20 C.F.R. § 404.-1529(c)(3)(i–vii). *See supra* note 10. Based

---

**13.** Also erroneous is the ALJ's statement that the record shows no medications for headache pain. At the very least, claimant's testimony provides evidence that she takes Extra-strength Tylenol for her headaches. Tr. 50–51, 60–62.

as it apparently was upon error, an unduly stringent reading of the controlling standard, and a lack of substantial evidence, the ALJ's conclusion regarding these subjective symptoms cannot stand.

Critical to claimant's ability to perform her past work as a clothes stitcher is her ability to sit, essentially, all day. The ALJ concluded that claimant's testimony that she "can neither sit, stand nor walk for more than 15 minutes at a time is not credible." Tr. 10. In part, the evidence upon which he based this conclusion, in addition to the fact that she "does not require more than aspirin for her allegedly severe back pain," Tr. 11, included her ability to drive for 30 minutes at a time and her ability to visit other people. Tr. 10. Because the ALJ provides no explanation as to the significance of visiting other people, it is difficult for the court to assess its relevance to the exertional activities at issue.

A fair reading of claimant's testimony regarding her driving, however, reveals that the ALJ misconstrued her remarks. Claimant actually testified that she drove two or three times a week, but that she had trouble doing so. Tr. 36. In response to her attorney's queries, she testified as follows:

Q Do you drive?

A Yes.

Q Do you drive frequently?

A Two or three times a week.

Q Do you have trouble driving?

A Yes.

Q What trouble do you have?

A It's because I can't turn my head like I want to help my back and my head, and when I'm—it's make me exhausted because I have to use my arm and when I'm going to be—I'm going back at home I have to lay down for awhile because I'm too tired. I'm too exhausted.

Q When you do drive these two or three times a week, how far do you drive.

A Around here in Manchester I can't go too far. If there's more than 10 miles,

than 10 miles then I have to stop and relax for awhile and—

Q Let's see, what—now, normally during the week do you go as far as 10 miles?

A No.

Tr. 36. This testimony actually supports claimant's credibility regarding her subjective complaints and their resulting functional restrictions. Furthermore, claimant never testified that she drove for 30 minutes at a time. The record reveals that claimant only said she could be comfortable for 30 minutes *riding* in a car, but even then with restrictions. Tr. 58. A fair reading of other testimony makes clear that claimant's husband normally drives, although her preference would be to drive because she uses the steering wheel to support and brace herself, stabilizing her back. *Id.* However, assuming arguendo that claimant could drive for 30 minutes, as the Eighth Circuit has made clear,

> evidence that a claimant can drive a car is not dispositive of the disability question.... [claimant] testified that he drives infrequently and only with difficulty. Consequently, his ability to drive is not inconsistent with his allegations of pain.

*Bishop v. Sullivan,* 900 F.2d 1259, 1263 (8th Cir.1990) (citations omitted). Under the prescribed evaluation of symptoms, driving a car can reasonably be construed as only one of an individual's daily activities, and "daily activities" is only one of many factors to be considered. 20 C.F.R. § 404.1529.

Additionally, the ALJ reasoned that claimant's testimony regarding her ability to sit, stand, or walk was not credible because "[n]o physician has noted that she could not sit for prolonged periods of time." Tr. 10–11. After a careful review of the record, the court finds this to be disingenuous at best. Dr. Wachs noted that "[h]er pain is ... aggravated by prolonged sitting, bending, weight-bearing, exertion, and prolonged standing." [14] Tr. 155. Furthermore, Dr. Hearne was unable to evaluate claimant's cardiac status us-

---

14. This oversight is even more egregious in light of the regulatory directive to consider precipitating or aggravating factors when evaluating symptoms. 20 C.F.R. § 404.1529(c)(3)(iii). The court also notes that an SSA interviewer documented that claimant "[s]eemed to be very uncomfortable sitting" during a personal interview. Tr. 83.

ing the traditional treadmill stress test because "the patient would be unable to walk on the treadmill due to her back problems." Tr. 133.

As to the ALJ's statement that "in fact most physicians note that she could return to work as a stitcher, which involves sitting for the majority of the work day," Tr. 11, the ALJ provides no support for this statement. The court finds, in fact, that only two physicians—both of the SSA nonexamining physicians—noted such an opinion. Tr. 85, 102. Dr. Wachs, an examining physician, opined that "her continuing disability at this time prevents her from returning to a piece work stitcher." Tr. 230. In fact, he went on to state that "[s]he may not be able to return to any function other than a stitcher and if this is the case then she will probably remain unemployed." Id. The function of weighing evidence is the Secretary's, Dupuis, supra, 869 F.2d at 624; however, the SSA regulations expressly direct that more weight is given to the opinion of an examining source than to the opinion of a nonexamining one. See Standards for Consultative Examinations and Existing Medical Evidence, 56 Fed.Reg. 36932, 36961 (1991) (amending 20 C.F.R. § 404.1527) (effective Aug. 1, 1991). Accordingly, the court finds that the ALJ's conclusion is not supportable.

Finally, in making his determination that claimant's subjective complaints were not credible, the ALJ found that "the record shows no effect on her activities of daily life from her alleged limitations." Tr. 11. The ALJ, however, fails to support this sweeping conclusion with any evidence or reasons, and the court finds this to be a preposterous assessment. The evidence is that claimant is a woman who is rarely at home alone because of her many limitations. Tr. 43, 57. In the past, her sister apparently lived with her in order to help her, or a grandchild was there. Tr. 57. Now her retired husband spends most of his time at home with her. Id. Even prior to his retirement some three years ago, her husband worked a 60–plus–hour week, only to go home to do the "vacuuming, floor mopping, dish washing and putting dishes in the dish washer for her." Tr. 229 (documentation by Dr. Wachs). Addi-

tionally, her disability reports and her testimony support the conclusion that she does very little of her household maintenance. Tr. 53–55, 57, 60, 79, 93, 95, 111. She can't make the bed, rarely does the laundry, needs help with the meals, can't do the dishes, never does any grocery shopping alone, and does not do the vacuuming, ironing, dusting, windows, or floors. Id. Furthermore, she can no longer do any recreational sewing or other hobbies, and had to stop going to social and community events. Tr. 60, 79. The ALJ's unsupported conclusion, directly contradicted by record evidence that is more than substantial, cannot possibly underpin his credibility finding.

In sum, the conclusions enunciated by the ALJ in support of his determination that claimant's testimony was not credible are not supported by substantial evidence. As such, the ALJ's credibility determination cannot stand. Furthermore, since the ALJ's finding at Step 4 of the sequential analysis was premised upon his perception that claimant's testimony was not credible, it too must be reversed.

Moreover, as to a proper Step 4 analysis, the court notes that there is authority for the proposition that it is

improper for the ALJ to rely on the vocational expert's testimony in determining that [claimant] could return to her past job. A vocational expert enters the sequential analysis for determining disability after a claimant is found unable to do her past relevant work. 20 C.F.R. § 404.1566(e). (Emphasis added.)

Smith v. Bowen, 837 F.2d 635, 637 (4th Cir. 1987). As expressed by one of our sister courts,

the ALJ's decision to exercise his discretion in summoning a V.E. to testify at the remand hearing and his reliance on the V.E.'s testimony in finding that Brown could engage in her past relevant work, was tantamount to a determination that Brown was unable to perform her past relevant work.

Brown v. Bowen, 682 F.Supp. 858, 860 (W.D.Va.1988) (emphasis in original). "It is axiomatic that the Secretary cannot use a

V.E. to override either his own regulations or rulings interpreting same." *Id.* Here, as in *Brown,* the record reflects that the ALJ not only exercised his discretion to summon a vocational expert, but also relied upon the vocational expert's testimony in reaching his decision that claimant was not disabled because she had the residual functional capacity to engage in her past relevant work. *Id.* *See* Tr. 11. Thus, totally apart from a determination which turns on claimant's credibility, there is a basis for concluding that claimant was unable to perform her past relevant work.

### C. Step 5 of the Sequential Analysis

■ As noted above, the court finds the record to be ambiguous as to any determination at Step 5 in the sequential analysis. 20 C.F.R. § 404.1520(f). To the extent that the ALJ made any implicit determination that there are jobs in the national economy that claimant can perform, this conclusion necessarily was also premised upon claimant's improperly discredited testimony. Thus, without revisiting the court's analysis of the ALJ's credibility determination, it too must be reversed. However, assuming arguendo (in spite of some evidence to the contrary) that the ALJ stopped his analysis at Step 4, as he arguably did, then the sequential process has not been completed. Because the court has found that claimant cannot return to her past work, the burden shifts to the Secretary to show that there are jobs in the economy that claimant can perform. *Heggarty v. Sullivan,* 947 F.2d 990, 995 (1st Cir.1991); *Rosado v. Secretary,* 807 F.2d 292, 294 (1st Cir.1986).

The fourth sentence of 42 U.S.C. § 405(g) authorizes a court to enter a judgment reversing the Secretary's decision, with or without remanding the cause for a rehearing. *Melkonyan v. Sullivan,* —— U.S. ——, ——, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991). While the court finds that the Secretary's denial of benefits lacks substantial evidentiary support, and further finds the evaluation process incomplete, no purpose would be served by a remand for further findings because any further evidence would only be cumulative and because claimant is per se disabled under the Secretary's regulations.

*See* 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 1, Rule 201.01; Table No. 2, Rule 202.01. *Cf. Dow v. Sullivan,* 774 F.Supp. 46, 48 (D.Me.1991) (sentence four remand appropriate in order to determine if plaintiff retained capacity to engage in gainful activity). "When the record is overwhelmingly in support of a finding of disability, there is no need to remand to the Secretary for further consideration." *Fowler v. Bowen,* 866 F.2d 249, 253 (8th Cir.1989). Nor, in the court's view, would remand be in keeping with the "benevolent purpose of the Social Security Disability Benefits Reform Act of 1984 ... which is to pay benefits to qualifying disabled persons and not just enable them to file claims, appeal adverse decisions and litigate perpetually in court." *Brown, supra,* 682 F.Supp. at 862.

Mrs. Morin, like the claimant in a recent First Circuit case, was

> [a]t the time of the ALJ's decision ... over 60 which is considered 'close to retirement age.' *See* 20 C.F.R. § 404. 1563(d). Section 404.1563(d) provides *inter alia*:
>
> > 'Person of advanced age. We consider that advanced age significantly affects a person's ability to do substantial gainful activity ... If you are close to retirement age (60–64) and have a severe impairment, we will not consider you able to adjust to sedentary or light work unless you have skills which are highly marketable.'
>
> A claimant of advanced age who is closely approaching retirement age must have transferable skills to sedentary or light work so closely related to other jobs which they can perform that they could be expected to perform these other identified jobs with a minimal amount of job orientation. 20 C.F.R. Pt. 404, Subpt. P Appendix 2, §§ 201.00(f), 202.00(f).

*Pineault v. Secretary,* 848 F.2d 9, 11 (1st Cir.1988).

It is undisputed that the vocational expert at Mrs. Morin's hearing testified that all of her past work was unskilled. "A person does not gain work skills by doing unskilled jobs." 20 C.F.R. § 404.1568(a). *See generally* SSR 82–41, 1982 WL 31,389 at *2 (1982) (an indi-

vidual does not acquire skills unless performing a job which is above the unskilled level). Thus, the transferability of skills can only be an issue when an individual's impairment prevents a return to past relevant work and that work has been determined to be skilled or semiskilled. *Id.* at *2. Such is not Mrs. Morin's situation. *Cf. Albors v. Secretary,* 817 F.2d 146, 149 (1st Cir.1986) (61–year–old claimant whose past work was skilled found to have transferable skills); *Pineault, supra,* 848 F.2d at 11 (where 64–year–old claimant's past work was semiskilled, remand was appropriate for further determination of whether his transferable skills were highly marketable).

The pertinent regulations provide that the "adversity of functional restrictions to sedentary work at advanced age (55 and over) for individuals ... who can no longer perform ... past work and have no transferable skills, warrants a finding of disabled" with only a narrow exception not here relevant. 20 C.F.R. Pt. 404, Subpt. P, Appendix 2, § 201.00(d). Similarly, "for individuals of advanced age who can no longer perform ... past work and who have a history of unskilled work experience ... the limitations in vocational adaptability represented by the functional restriction to light work warrant a finding of disabled." *Id.* at § 202.00(c). The court need go no farther. Whichever of these two exertional levels is most accurate, the result is a finding of disabled.

### III. Conclusion

For the reasons herein stated, defendant's motion for order affirming the decision of the Secretary (document no. 6) is denied. Claimant's motion for an order reversing the decision of the Secretary (document no. 7) is granted.

The Secretary's decision is reversed, and this case is remanded, pursuant to sentence four of 42 U.S.C. § 405(g), to the Secretary

for the limited purpose of awarding benefits to Mrs. Morin in the appropriate amount based upon her 1987 application for same.

SO ORDERED.

### ORDER ON MOTION TO ALTER AND AMEND

Previously in this social security disability case, the court in its order of April 10, 1992, reversed the decision of the Secretary of Health and Human Services denying benefits to claimant. Before the court at this time is the Secretary's motion to alter and amend that judgment. *See* Rule 59(e), Fed.R.Civ.P.

While the Secretary's motion is far from frivolous,[1] and the court has the power to amend its findings of fact and conclusions of law, even to the point of reversing its earlier judgment, as the Secretary urges, it declines to do so. *National Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc.,* 899 F.2d 119, 124 (1st Cir.1990). Careful review and consideration by the court of its previous order and defendant's arguments do not compel such amendments. Discussion of the court's reasoning need not be lengthy, and, as the factual background of this case is extensively detailed in its previous order, it will not be repeated herein.

The crux of the matter previously before the court was whether there was substantial evidence in the record to support the ALJ's conclusion that claimant's testimony regarding subjective complaints of pain and resulting functional limitations was not credible. *See Irlanda Ortiz v. Secretary,* 955 F.2d 765, 769 (1st Cir.1991) (Secretary's findings must be upheld if supported by substantial evidence). This credibility determination was central to the ALJ's finding that claimant had the present residual functional capacity (RFC) to return to her past relevant work as a clothing stitcher.

---

1. In part, the Secretary contends that the court should reconsider its judgment because it applied an incorrect legal standard. *See Smith v. Bowen,* 837 F.2d 635, 637 (4th Cir.1987) (standing for the proposition that use of vocational testimony at Step 4 of sequential analysis is improper). However, while the court unfortunately muddied the analytical waters with this suggestion, erro-

neous under controlling law in this circuit, *see, e.g., Torres v. Secretary,* 870 F.2d 742, 744 (1st Cir.1989), it was made only in the alternative. The court's analysis and conclusion regarding the Administrative Law Judge's (ALJ's) determination at Step 4 did not rest upon this ground, and thus need not fall.

In addition to his assertion that the ALJ made proper use of vocational expert testimony, the Secretary, in arguing for an amended judgment, asserts that the ALJ properly assessed claimant's RFC and credibility. At Step 4 in the sequential evaluation, the Secretary concedes that claimant made the necessary threshold showing that she could not return to her former work because of her disability. *See Santiago v. Secretary,* 944 F.2d 1, 5 (1st Cir.1991). It is regarding the Secretary's subsequent obligation to then compare the demands of claimant's former work with her *present* RFC where the court and the Secretary are not in accord. *Id.*

The Secretary contends that various substantial evidence exists, primarily RFC assessments submitted by two nonexamining and nontestifying physicians and relevant vocational testimony, to correctly support the ALJ's conclusion of not disabled. The Secretary argues that the extent of a claimant's functional loss is often best represented by an expert's RFC evaluation, such as the two recent ones in the medical record here at issue. *See Gordils v. Secretary,* 921 F.2d 327, 329 (1st Cir.1990) (lone RFC assessment submitted by nonexamining and nontestifying physician, when considered with another medical report in the record, found to constitute substantial evidence). Furthermore, the Secretary claims that there is no contemporaneous, objective medical evidence from any of claimant's treating or examining physicians which contradicts the RFC assessments of the two SSA consultants. The court finds, however, that the Secretary's arguments miss the mark under the facts of this case.

 There is little doubt that RFC assessments submitted by SSA experts will serve, at the very least, as a starting point in the ALJ's determination of an individual's ultimate RFC. This is so, even when submitted without benefit of claimant's testimony at the hearing and, as here, without benefit of further medical evidence submitted at the time of the hearing. However, the Secretary's regulations provide for a modifying process that is responsive to the impact of a

claimant's particular symptoms, such as pain, on his or her RFC as it is otherwise assessed. *See Evaluation of Symptoms, Including Pain; Final Rule,* 56 Fed.Reg. 57,-928, 57,941–43 (1991) (to be codified at 20 C.F.R. § 404.1529). Furthermore, the Secretary's regulations do not set forth any "standard" of acceptable levels of pain. *Id.* at 57,933. Rather, the benchmark of the fact-specific process is an individualized evaluation. *Id.* That process of possibly modifying an RFC necessarily takes into account claimant's credibility on subjective matters.

The court finds no need to resolve the objective medical evidence issue raised by the Secretary of whether or not recent medical evidence from Drs. Gagne, Shea, Horan, Larouche, and Bell contradicts the RFC assessments of the two consulting doctors. Even assuming that it does not, the very point of factoring into the process an analysis under *Avery v. Secretary,* 797 F.2d 19 (1st Cir.1986), and now 20 C.F.R. § 40.1529, is that situations do exist in which an individual's subjective symptoms "suggest the possibility of a greater restriction of the individual's ability to function than can be demonstrated by objective medical evidence alone." Social Security Ruling ("SSR") 88-13, 1988 WL 236011, at 3 (1988). In these situations, before a complete evaluation of RFC can be made, other evidence must be considered. *Avery, supra,* 797 F.2d at 23; 20 C.F.R. § 404.1529(c)(3). Although the ALJ herein considered the relevant factors, for the most part, the court found that his findings on the credibility issue were not supported by evidence such "as a reasonable mind might accept as adequate to support" his conclusions.[2] *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The court found and still maintains that the record does not reveal substantial evidence to refute claimant's subjective complaints. This resolution is dispositive of the question of whether claimant has the present RFC to return to her past relevant work.

If claimant's testimony is credible, as the court so found, then sufficient relevant evi-

**2.** This is so, even if discounting medical evidence from Dr. Wachs as arguably not recent enough to

be highly relevant, as the Secretary suggests.

dence exists regarding the requisite section 1529(c)(3) factors to compel a reasonable mind to conclude that claimant's present RFC is not truly represented by the two RFC assessments submitted by the consulting physicians in August and December of 1989. Upon due consideration, the evidence of record also supports the conclusion that the statements of the claimant and her doctors are not inconsistent with the objective medical findings, and thus they permit a finding of disabled, where medical findings alone would not, *Avery, supra,* 797 F.2d at 21, based upon the existence of symptom-related limitations of function. In fact, vocational expert testimony provides supportive evidence on this point. *See* Transcript at 66, 68 (an individual with claimant's functional limitations would be unable to perform the stitching job).

### Conclusion

In sum, for the reasons set forth herein and in its initial order, the court affirms its reversal of the ALJ's Step 4 determination that claimant has the present RFC to return to her past relevant work. Therefore, defendant's motion to alter and amend judgment (document no. 15) is denied.

SO ORDERED.