Kalapinski v. SSA                    CV-96-104-JD  10/22/96

UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


Eileen Kalapinski

        v.                              Civil No. 96-104-JD

Commissioner, Social
Security Administration


                            O R D E R


     The plaintiff, Eileen Kalapinski, brings this action

pursuant to section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), seeking review of a final decision of the defendant,

Commissioner of the Social Security Administration

("Commissioner"), denying her claim for benefits under the Act.

Before the court are the plaintiff's motion for an order

reversing the decision of the defendant (document no. 4), and the

defendant's motion for an order affirming the Commissioner's

decision (document no. 5).


                           Background

     Pursuant to Local Rule 9.1, the parties have filed a joint

statement of material facts, which the court incorporates

verbatim:

     The plaintiff filed an application for disability insurance
benefits under Title II of the Social Security Act, as amended
(the "Act"), on February 11, 1994 (Tr. 71-74) alleging an
inability to work as of February 1, 1994 at age 46.  Plaintiff

alleged disability on the basis of degenerative disk disease to neck and lower spine, dysfunctional joint disease to right hip, epicondylitis and tendinitis of elbows (Tr. 98).

Plaintiff has an Associates Degree in Secretarial Science (Tr. 51) and has past work experience as a general office clerk and as a billing clerk (Tr. 65). Plaintiff's last date of insured status for disability purposes is December 31, 1998 (Tr. 25). Her application was denied initially (Tr. 85-86) and on reconsideration (Tr. 91-93) by the Social Security Administration. An Administrative Law Judge ("ALJ"), considered the matter de novo, and on May 15, 1995, issued his decision that the plaintiff was not entitled to disability benefits (Tr. 14-30). The Appeals Council denied Plaintiff's request for review (Tr. 5-6).

A.    Medical Evidence Prior To Alleged Onset Date.

Prior to Plaintiff's alleged onset date, she was treated by her family physician, Dr. Romanowsky, who ordered x-rays of her lumbar spine and right hip. These x-rays showed, "a mild disc space narrowing at L4-5 and more severe narrowing. At L5-S1, there is a subchondral sclerosis and vacuum phenomenon seen. The study is otherwise unremarkable. AP view of the pelvis and a frog lateral view of the right hip demonstrates no soft tissue or bony abnormality. The hip appears unremarkable." (Tr. 147).

Dr. Romanowsky sent the plaintiff to Northeast Rehabilitation Hospital on July 16, 1992, for further evaluation. In her initial conference, her physical therapy assistant noted that the plaintiff's posture revealed "increased lumbar lordosis with an elevated lateral skin fold on right", however her range of motion was normal in her back as was her motor strength. (Tr. 165).

On August 6, 1992, the plaintiff had a Lumbosacral Spine CT Scan, which revealed "The bone windows demonstrate a right-sided laminectomy at L5. There is marked disc height narrowing at L5-S1. There is abnormal soft tissue anterior and to the right of the thecal sac at L5 with obscuration of the fat surrounding the right S1 nerve root. The L5 exiting root does not appear to be involved. I cannot be certain whether this represents recurrent disc herniation or postoperative scar. At L4-5, there is a mild diffuse posterior bulge which is not felt to be significant. No abnormality is seen at L3-4." An MRI was ordered to ascertain

2

whether there was recurrent disc herniation or postoperative scarring. (Tr. 148).

The MRI of August 13, 1992, revealed "a loss of disc height and signal intensity involving the L4-5 and L5-S1 discs. At the L4-5 level, there is mild bulging at the annulus fibrosis causing flattening of the ventral sac but no impingement on neural structures. The L4-5 facet joints are unremarkable." (Tr. 149).

On October 9, 1992, the plaintiff began chiropractic treatment with Dr. Warren B. Barclay for "correction of a chronically recurring multiple vertebral subluxation complex." (Tr. 190).

In January 1994, Dr. Romanowsky referred the plaintiff to Scott Masterson, M.D. of Northeast Rehabilitation Hospital for evaluation of right elbow pain. Dr. Masterson diagnosed the plaintiff with "right lateral epicondylitis that has not responded to first line of treatment which would be rest, decreasing physical activities, nonsteroidal anti-inflammatories, and a store-bought Future wrist splint." He further recommends "a program with an occupational therapist who specialized with hand patients." (Tr. 168-169).

Additionally, the plaintiff was treated for diarrhea and blood in her stool prior to her alleged onset date (Tr. 308-313). A flexible sigmoidoscope showed only some internal hemorrhoids (Tr. 309). The plaintiff was treated with medication and stool softeners and her condition improved greatly within six weeks (Tr. 310).

Further, prior to her alleged onset date, the plaintiff was treated for her anxiety at the Center for Life Management (Tr. 241-307). She had been "experiencing panic attacks consisting of anxiety, palpitations, hyperventilation and fear of losing control." (Tr. 241). Here, the plaintiff was diagnosed with a panic disorder, rule/out generalized anxiety disorder and rule/out agoraphobia. She was treated with medications and counseling. Progress notes and evaluations of the plaintiff's condition during this time show that the plaintiff as anxious, although she was consistently cooperative, oriented, and relevant (Tr. 242-243, 268, 300, 307).

B.    Medical Evidence Following Alleged Onset Date.

Dr. Masterson's report of February 28, 1994 indicates that the plaintiff started a program with an occupational therapist. "She has received some ultrasound, some deep massage, and she is wearing a resting wrist splint.  This all helped somewhat.  She also continues to take Naprosyn 500 mg. b.i.d. which she says helps."  (Tr. 171).

On March 22, 1994, Dr. Masterson's report states, "She seems to respond to initial therapy but has somewhat of a roller coaster type response with therapy in terms of pain.  She will have short periods of time where she will have decreasing pain, and then the pain will return with no precipitating event."  He put the plaintiff's therapy on hold until he was able to review the plaintiff's previous medical records from her back and cervical treatment.  (Tr. 172).

Upon review of her records and x-rays, Dr. Masterson found, "signs of old degenerative changes at L5-S1, post-laminectomy changes, and scarring.  There were no new findings on these studies."  Her neck x-rays did show, "C5-6 spondylosis with degenerative spurring, and C6-C7 degenerative spondylosis with degenerative spondylosis."  Dr. Masterson felt that the plaintiff had reached maximum medical improvement and, therefore, "set her up for a Physical Capacity Evaluation to document objective physical capacities and make any further decisions about vocational activities."  (Tr. 173).

On June 30, 1994, an MRI of the cervical spine was performed and revealed, "marked hypertrophic changes are seen about narrowed interspace at C5-6 and C6-7.  There is a slight impingement on the cord of slightly bulging disc contents at C5-6.  Slight hypertrophic degenerative changes are seen about the C4-5 interspace.  There is uncovertebral joint spurring with apparent slight encroachment on the left 6th neural foramen.  No evidence of a herniated disc is seen."  (Tr. 191, 194).
Nerve conduction studies and electromyography, performed on July 7, 1994, were suggestive of, but no[t] entirely diagnostic of a largely acute right C6 radiculopathy[1] mild in nature (Tr.

---

[1]Disease of the nerve roots.  Id. at p. 1404.

4

192). Other root involvement, peripheral neuropathy[2], and focal mononeuropathy[3] were not noted. "Further clinical correlation and imaging studies of cervical spine are recommended." (Tr. 192).

On July 19, 1994, Dr. Masterson noted that, "Although the tests do not 100% coincide with each other, they do point to problems at the C5-C6 level causing her cervical radiculopathy. At this point, she is using a home cervical traction and home exercises and this problem seems to be under control. The only limitation is her work hours which are only four to six per week." (Tr. 215).

In a letter "To Whom It May Concern" dated July 28, 1994, Dr. Romanowsky outlined the plaintiff's symptoms, treatment and diagnosis since June 1992. In August of 1992, her diagnosis after testing was as follows:

*   Post Laminectomy at L5 on right with abnormal soft tissue anterior and to the right of the thecal sac and S1 nerve root;

*   Mild bulging at the annulus fibrosis L4-5, L5-S1;

*   Bursitis right hip;

*   L-5 Hemilaminectomy Defect;

*   Degenerative Disc Disease at L4-5 with associated disc bulge.

Dr. Romanowsky noted that, "Supportive medical treatment as well as Physical Therapy was prescribed by me. I also discussed with Eileen that her current occupation was aggravating her condition and decreasing her hours at work would be necessary." (Tr. 144-145).

Dr. Romanowsky further reviews his January 1994 diagnosis of tendinitis. "Upon examination it was determined that Eileen had

_____

[2]A functional disturbance or pathological change in the peripheral nervous system, which involves several peripheral nerves simultaneously. Id. at pp. 1132, 1330.

[3]Disease affecting a single nerve. Dorland's at p. 1054.

5

tendinitis in elbows as well as Epicondylitis.  Wrist splints as well as pneumatic arm bands were prescribed by me.  At this visit, I discussed usage of a computer as an irritant to this condition.  I recommended that Eileen see Dr. Masterson, a Physiatrist, for neck and arm evaluation."  (Tr. 144-145).

Dr. Romanowsky's July 28, 1994 letter concludes, "It is therefore my medical opinion that Eileen is unable to work light duty or otherwise because of her above-stated condition. Prognosis at this time is fair - poor due to chronic recurrence of her degenerative arthritis and tendinitis."
"Additional Diagnosis for the record:
Anxiety Disorder - Dr. Sharka-Salem, NH
Asthma, Mild Emphysema - Dr. Coleman-Andover, MA
Multiple allergies, chronic Bursitis - Dr. Hannaway-Salem, MA" (Tr. 145).

On August 5, 1994, Dr. Masterson wrote a letter "To Whom It May Concern."  This letter states that the plaintiff has severe limitations on her activities, including work.  "She can only tolerate a maximum of six hours per week of sedentary work." (Tr. 175).

In January 1995, Dr. Constance M. Passas, a rheumatologist, examined the plaintiff at the request of Dr. Romanowsky (Tr. 230-233).  Dr. Passas found that the plaintiff's grip strength was mildly decreased in both hands, but that her Tinel's[4] and Phalen's signs[5] were both negative (Tr. 232).  Additionally, the plaintiff's reflexes were normal, as was her motor strength. Plaintiff had mild limitation of motion in her lumbar spine and some tender points in her spine and arms; however, her straight leg raising was negative and her Fabier's (sic) sign[6] was negative (Tr. 232).  Dr. Passas diagnosed the plaintiff with a

---

[4]A tingling sensation at the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve.  Id. at p. 1527.

[5]For detection of Carpal Tunnel Syndrome.  Id. at p. 985.

[6]With the patient supine, the thigh and knee are flexed and the external malleolus is placed over the patella of the opposite leg; the knee is depressed, and if pain is produced thereby arthritis of the hip is indicated.  Dorland's at p. 1681.

6

fibromyalgia syndrome which was not disabling; degenerative arthritis of the cervical spine and low back; and chronic elbow complaints which were not epicondylitis and instead part of the fibromyalgia[7] (Tr. 232-233).  In a medical assessment of the plaintiff's physical abilities, Dr. Passas stated that the plaintiff could lift up to 10 pounds, stand and/or walk for 1 hour at a time, up to 4 hours a day, and sit for 1-2 hours at a time, up to 4 hours a day (Tr. 234-235).  Additionally, the plaintiff could occasionally climb, balance, stoop, and crouch, but must avoid kneeling, crawling and heights (Tr. 236-237).  No other restrictions were noted.

Dr. Romanowsky's medical assessment of February 2, 1995, states that the plaintiff can lift and carry less than 5 pounds occasionally.  He states that she can sit for 30 minutes uninterrupted and can only sit a total of 2-4 hours in an 8-hour day.  She can stand and/or walk 2-4 hours in an 8-hour day and for only 20 minutes without interruption.  (Tr. 222-226).

Discussion

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In reviewing a Social Security disability decision, the factual findings of the Secretary "shall be conclusive if supported by `substantial evidence.'"  Irlanda Ortiz v. Secretary of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42

_____

[7]A group of common nonarticular rheumatic disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures. See The Merck Manual, 16th ed., at p. 1369.

7

U.S.C. § 405(g)).[8]  The court "`must uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion.'"  Id. (quoting Rodriguez v. Secretary of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)); accord Richardson v. Perales, 402 U.S. 389, 401 (1971).  The record must be viewed as a whole to determine whether the decision is supported by substantial evidence.  Frustaglia v. Secretary of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Rodriguez, 647 F.2d at 222.  Moreover, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz, 955 F.2d at 769 (citing Rodriguez, 647 F.2d at 222); see also Burgos Lopez v. Secretary of Health & Human Servs., 747 F.2d 37, 40 (1st Cir. 1984).

---

[8]Substantial evidence is "`such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

8

I. Step Three of the ALJ's Analysis

The plaintiff's first contention is that the ALJ erred at step three of his analysis[9] in concluding that the "[t]he record

[9]The ALJ's decision followed the five step sequential evaluation process set forth in Goodermote v. Secretary of Health and Human Services, 690 F.2d 5 (1st Cir. 1982), which is based on the statutory language of 20 C.F.R. § 404.1520 (1992). The five steps are as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
> Second, does the claimant have a severe impairment? A 'severe impairment' means an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions.' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
> These first three [steps] [] are 'threshold'[steps] []. If the claimant is working or has the physical or mental capacity to perform 'basic work-related functions,' he is automatically considered not disabled. If he has an Appendix 1-type impairment, he is automatically considered disabled. In either case, his claim is determined at the 'threshold.' If, however, his ability to perform basic work-related functions is impaired significantly ([step] [] 2) but there is no 'Appendix 1' impairment ([step] [] 3), the SSA [Social Security Administration] goes on to ask the fourth question:
> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

Goodermote, 690 F.2d at 6-7.

does not show an impairment or a combination of impairments which meet or equal the severity of any impairment listed in [20 C.F.R. Pt. 404, Subpt P., App. 1]." Specifically, the plaintiff contends that she satisfied listings 1.04(A) and 1.05(C), and therefore should automatically have been found disabled.

Listing 1.04 provides:

<u>Arthritis of one major joint in each of the upper extremities (due to any cause)</u>:

With history of persistent joint pain and stiffness, signs of marked limitation of motion of the affected joints on current physical examination, and X-ray evidence of either significant joint space narrowing or significant bony destruction. With:

A. Abduction and forward flexion (elevation) of both arms at the shoulders, including scapular motion, restricted to less than 90 degrees.

Listing 1.05 provides:

<u>Disorders of the Spine</u>:

. . .

C. Other vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

1. Pain, muscle spasm, and significant limitation of motion in the spine; and

2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

10

Although the plaintiff has made conclusory allegations concerning her satisfaction of these listings, the evidence to which she has pointed reveals no X-ray evidence of joint space narrowing or significant bony destruction in any major joint of her upper extremities, and is silent as to her abduction and forward flexion, as required by listing 1.04(A). In addition, the plaintiff has pointed to no evidence in the record of the motor or reflex loss required to satisfy listing 1.05(C). As such, the court finds that the ALJ properly concluded that the plaintiff did not hold any of the impairments set forth of Subpart P, Appendix 1 or their equivalent, and properly moved on to step four of the five-part sequential evaluation.

II.  Step Four of the ALJ's Analysis

The plaintiff's remaining arguments contest the ALJ's findings at step four of the sequential evaluation, in which he concluded that the plaintiff had the residual functional capacity to perform her past relevant work as a billing clerk and therefore was not disabled within the meaning of the Social Security Act at any time through the date of the decision. The court considers the plaintiff's arguments seriatim.

11

A.  Evidence Pertaining to the Plaintiff's Daily Activities

The plaintiff's first claim concerning step four of the ALJ's analysis is that the ALJ improperly concluded that the plaintiff maintained an "extensive activity level," including "washing clothes, washing dishes, light cooking, housework, reading, photography, gardening, shopping, knitting, crocheting, watching television, [and] working with dried flowers."  Tr. at 19.  Although the plaintiff refers to testimony in the record indicating that she received assistance in some of these activities or only engaged in them for a short periods of time, her own testimony reveals, inter alia, that she tried to do all of the cooking and tried to wash small loads of laundry on a daily basis.  Tr. at 60.  In addition, the ALJ expressly recognized the limitations on the plaintiff's daily activities caused by pain in addressing the relation of the plaintiff's daily activities to her residual functional capacity.  See Tr. at 21.  There being substantial evidence to support the ALJ's conclusion concerning the plaintiff's daily activities, the court finds no error.

B.  Medical Evidence

Relying on Agresti v. Secretary of Health & Human Servs., 631 F. Supp. 1245, 1249-50 (D. Mass. 1986), the plaintiff next

contends that the ALJ erred in ignoring the recommendations of the plaintiff's treating physicians and relying exclusively on the report of Dr. Passas, the rheumatologist who examined the plaintiff on only one occasion. Passas diagnosed the plaintiff with non-disabling fibromyalgia syndrome and degenerative arthritis of the cervical spine and lower back, and stated that the plaintiff could lift up to ten pounds, stand and/or walk up to four hours per day (up to one hour without interruption), and sit up to four hours per day (up to two hours without interruption, with opportunity to "get up and down" every twenty to thirty minutes). Tr. at 232-36. The ALJ accepted these conclusions. See Tr. at 9.

The court finds the plaintiff's argument unavailing. In evaluating the medical evidence before him, the ALJ expressly stated that he was "mindful that some of the opinions from the claimant's treating and examining sources suggest that the claimant's work capacity is significantly compromised such that she would either be unable to work or be unable to sustain more than a part-time schedule." Tr. at 22. In addition, the ALJ stated that he relied not only on the diagnosis of Dr. Passas, but also on the diagnosis of the plaintiff's treating physician, Dr. Romanowsky, "whose medical assessment of the claimant's capacity to perform work-related activities showed that the

13

claimant had a capacity for a range of sedentary work," Tr. at 24, see also Tr. at 22. Thus, the record indicates that rather than focusing solely on the testimony of a nontreating physician, the ALJ considered the entire record and found the report of Dr. Passas to be the most recent, the most complete, and the most reliable. The court will not second-guess this conclusion.

C. Past Relevant Work

The plaintiff's final set of claims concern the ALJ's finding that the plaintiff's residual functional capacity permitted her to perform her past relevant work. Her first contention is that the ALJ improperly relied on the testimony of a vocational expert in determining that the plaintiff could perform her duties as a billing clerk.[10] However, even assuming arguendo that the vocational expert's testimony would only become relevant upon a finding that the plaintiff was unable to perform her past relevant work, see Morin v. Secretary of Health & Human Servs., 835 F. Supp. 1414, 1427 (D.N.H. 1992), the ALJ's opinion indicates that he relied on other substantial evidence -- i.e., the "records outlining the claimant's job functions," Tr. at 12,

--------

[10]The vocational expert testified that the plaintiff's activity as a billing clerk constituted sedentary work activity, but that her positions as an office specialist and an office clerk required light exertional activity. See Tr. at 25, 65-66.

14

which include the plaintiff's own description of the requirements of her position as a billing clerk -- in determining that the plaintiff's residual functional capacity did not prevent her from returning to her position as a billing clerk. See also U.S. Department of Labor, Dictionary of Occupational Titles 214.362-042 (4th ed. rev. 1991) (listing billing clerk as a sedentary position). As such, the plaintiff's argument is unavailing. The plaintiff's second claim is that the decrease in her workload and her employer's conclusion that she was unable to perform her work are proof of her inability to perform her duties. However, as noted above, the record contains substantial evidence indicating that the plaintiff's residual functional capacity fell within the requirements of her position as a billing clerk. Accordingly, the court will not disturb the ALJ's conclusion. Finally, the plaintiff's claim concerning the lack of testimony about the availability of billing clerk positions in the national economy is without merit. Such evidence is only necessary if the ALJ reaches the fifth step of the five-step analysis.

## Conclusion

The plaintiff's motion for an order reversing the decision of the defendant (document no. 4) is denied.  The defendant's motion for an order affirming the Commissioner's decision (document no. 5) is granted.  The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

October 22, 1996

cc:  Vicki S. Roundy, Esquire
     David L. Broderick, Esquire