Richard Elliott v. SSA          CV-97-276-B    09/29/98

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Richard Elliott

    v.                                    Civil No. 97-276-B

Kenneth S. Apfel, Commissioner
of the Social Security
Administration


MEMORANDUM AND ORDER

Richard Elliott has a history of health problems, including back and respiratory difficulties.[1] Elliott first applied for Title II Social Security Disability Income ("SSDI") benefits on September 15, 1992. The Social Security Administration ("SSA") denied Elliott's application at the initial determination level on December 30, 1992. Elliott did not appeal and his insured status expired the following day. Elliott filed a subsequent application for disability benefits on November 29, 1994. The SSA denied Elliott's second claim, with an Administrative Law Judge ("ALJ") rendering an unfavorable decision on September 29,

_____

[1] Elliott's 1994 application for disability insurance benefits alleged an inability to work since November 17, 1986, due to chest pain, carotid artery disease, arteriosclerosis, pulmonary disease, low back pain, and glaucoma.

1

1995.  The Appeals Council denied Elliott's request for a review of the ALJ's decision on April 10, 1997.

Elliott brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g) (West Supp. 1998) ("the Act"), seeking review of the SSA's 1995 decision denying his claim for benefits.  Elliott claims that the ALJ's determination that he was not disabled within the meaning of the Act and that he could perform light work as defined by SSA regulations is not supported by substantial evidence.

For the reasons that follow, I grant Elliott's motion and remand the case to the ALJ for further review.

## I.  <u>FACTS</u>[2]

Elliott was born on October 9, 1940, and was 54 years old when ALJ Robert S. Klingebiel denied his second claim in 1995. He is a high school graduate who, prior to his alleged disability, worked for more than 20 years as a mill man, supply man, mold cleaner, and rubber cutter for Goodyear Tire and Rubber Company.  He has not engaged in substantial gainful employment

---

[2]  Unless noted otherwise, the following facts are taken from the Joint Statement of Material Facts submitted by the parties to this action.

2

since November 17, 1986.  (Tr. 15).[3]

Elliott suffered a back injury in July 1986 while carrying a bureau down a flight of stairs.  Dr. David Russo diagnosed Elliott with recurrent acute low back strain.  Dr. Russo prescribed five weeks of physical therapy before clearing Elliott to return to work on August 21, 1986.  A week after returning to work, Elliott was treated for low back muscle spasms and stiffness in the emergency room of Mt. Ascutney Hospital.  Elliott received prescriptions for Valium and Advil.  He returned to the emergency room once again on November 17, 1986, after suffering low back pain while working.  Elliott later told Dr. A. S. Goldstein that he had crawled under a machine to remove an object when he felt intense pain, then numbness, before he collapsed on the floor and had to be assisted by co-workers.  Dr. Goldstein diagnosed Elliott with "recurrent episodes of disc protrusion probably involving the 5th lumbar root on the right."  He indicated that Elliott had a good prognosis for recovery, but that recurrent episodes were likely.

Elliott then saw Dr. C. Frederick Lord, an orthopaedic surgeon, on March 6, 1987, complaining of low back pain radiating

---

[3] "Tr." refers to the certified transcript of record filed by the Commissioner of the Social Security Administration with the Court.

3

into his buttocks, legs, and feet. He also complained of numbness and tingling, which made it difficult to remain in one position. Dr. Lord diagnosed Elliott with spinal stenosis with superimposed L4-L5 disc herniation. He indicated that Elliott's condition would bar him from returning to his job, as it required heavy manual labor. He prescribed continued conservative treatment, but did not rule out surgery. That same month, Elliott saw Dr. William Kois, a physiatrist,[4] at the request of his insurance company. Dr. Kois observed that Elliott could sit for about 30 minutes, if allowed to continuously shift his weight or position. He could stand for only 10 minutes and could go up and down stairs using safety devices. He also found that Elliott had a limited range of motion in his spine and appeared to be suffering significant pain. Dr. Kois determined that surgery was appropriate.

Dr. Lord performed back surgery on Elliott on October 22, 1987, after a September visit in which Elliott reported worsening symptoms. A CT scan and myelogram performed on October 21, 1987, confirmed bulging of the L5-S1 disc with impingement of the right S1 nerve root. After surgery, Elliott reported that he had no

---

[4] The specialization in physical or rehabilitation medicine.

4

leg pain but did feel tingling in his right leg.  Elliott again complained of tingling, coupled with numbness, at follow-up appointments with Dr. Lord in November and December 1987 and January 1988.  He also exhibited a stiff range of motion in his back and pain upon backward and lateral bending.  Dr. Lord prescribed Motrin, Orudis, and Depo-Medrol.  Dr. Lord then referred Elliott to a physical therapist and continued to follow his progress through July 1988.

Elliott participated in physical therapy at Mt. Ascutney Hospital during January and February 1988.  At one appointment, Elliott was unable to perform due to respiratory problems.  At another appointment, he reported increased pain after sneezing the previous week.

Elliott returned to Dr. Lord in February 1988.  Dr. Lord found that Elliott had decreased right ankle jerk reflex, decreased sensation to pin prick, muscle spasms in his lower back upon straight leg raising, and hamstring tightness.  Dr. Lord referred Elliott to Dr. Leonard Rudolph, an orthopaedic surgeon, who recommended continued conservative treatment.  Dr. Lord agreed, and sent Elliott to Dr. Seddon Savage, a board certified anesthesiologist, to consider epidural and trigger point steroid injections.

5

Elliott saw Dr. Savage in March 1988. She later administered epidural steroid injections to Elliott, who stated that the injections produced no change in the feeling of his lower back, but that they did decrease neck stiffness for several hours. She also referred Elliott to physical therapist William Cioffredi. Elliott saw Cioffredi for regular physical therapy sessions from March until August 1988.

Elliott's doctors noted some signs of improvement during this time, but also frequent setbacks due to sneezing, trying to remove a car battery, and driving to doctor appointments. Elliott no longer hunted or fished. He spent most of his time reading, listening to the radio, or watching television. He reported that he suffered from night-mares, as well as pain or spasms which woke him up at night. His appetite was poor. He had also become irritable, which led to stressful relationships with his family.

On March 9, 1988, Dr. Lord completed a functional capacity assessment of Elliott, stating that Elliott should never lift or carry more than 10 pounds. He estimated that Elliott could return to work in July 1988 on a part-time basis, working three to four hours a day. (Tr. 395-95).

6

In an August 24, 1988, discharge note, Cioffredi wrote that Elliott continued to improve through physical therapy and was probably able to return to "limited periods of light duty activity." He noted that Elliott's symptoms were "periodically aggravated," but that Elliott was able to resolve them with his home exercise program. (Tr. 292).

Dr. Lord wrote to an employment consultant for Elliott's worker's compensation carrier on August 25, 1988, that Elliott's condition was essentially unchanged. Although he recommended Elliott participate in a work hardening program, he noted that he was not optimistic. Dr. Lord wrote that "Although [Elliott] is certainly not crippled, on the other hand he is not in any way, shape or form in any condition to be employed gainfully."

In a letter dated September 11, 1988, Dr. Savage wrote that, if Elliott continued to improve, he could return to a sedentary or light job on a part-time basis. She stated that his work should not involve lifting or carrying more than 10 pounds (with rare lifting or carrying of less than 10 pounds), prolonged sitting or standing, or repetitive arm movements. She advised that Elliott suffers from respiratory problems and that his primary care physician, Dr. Beach Conger, should be contacted to determine whether the problems would further restrict Elliott's

7

capabilities. Dr. Savage examined Elliott two days later and noted that Elliott could return to sedentary work on a part-time basis. Elliott reported that he was worried about returning to work because of the increased pain he suffered with increased activity. (Tr. 301-02). Dr. Savage observed in her examination notes that Elliott's flexibility and pain had worsened since discontinuing physical therapy three weeks earlier. She recommended that he return for weekly physical therapy sessions.

In a functional capacity report dated September 13, 1998, Dr. Savage stated that Elliott could never lift or carry more than 10 pounds, and could only occasionally lift or carry up to 10 pounds. (Tr. 396-97). She noted that he could walk for a few minutes at a time for a total of one hour, and sit or stand for a few minutes at a time for a total of four hours. Dr. Lord completed a similar assessment on September 16, in which he stated that he "agree[s] totally" with Dr. Savage's report. (Tr. 399).

The following month, Dr. Savage again examined Elliott, who told her that he was stretching and exercising at home and that his back was stable. He complained of neck pain accompanied by a "sickening, nauseating discomfort." She concluded that Elliott's improvement was stable, but that he had degenerative joint

disease of the neck, which she treated with a nonsteroidal anti-inflammatory medication.  She treated Elliott a final time in December 1988.  He reported at that appointment that he had tried to increase his activities, but he had suffered muscle spasms since trying to cut and trim a Christmas tree.

Between April 1989 and March 1990, Elliott saw Dr. Kois, Dr. Rudolph, and Dr. Conger for his back condition.  In a November 1989 letter, Dr. Rudolph calculated that Elliott had a 15 percent permanent disability of his entire body.  Dr. Conger and Dr. Kois recommended physical therapy and work hardening programs.  Elliott used a back brace to keep from bending, and told Dr. Kois that it seemed to help.  In March 1990, Dr. Kois noted that the brace restricted Elliott's lung capacity and that Elliott's respiratory illness was complicating his rehabilitation.  He wrote that Elliott needed a more aggressive physical therapy program, noting that "I cannot see how we can make Mr. Elliott a viable member of the work force unless a coordinating program is developed."

Elliott underwent a functional capacity assessment on May 7, 1990.  Linda Smith-Blais, a physical therapist, reported that Elliott could sit for one to two hours, 20 minutes at a time, for a total of three to four hours; stand for 50 to 60 minutes at a

time for a total of four hours; and walk for two to three hours. She noted that he could occasionally bend, stoop, squat, climb stairs, crouch, kneel, and balance. He could crawl frequently, she stated, and he could push or pull up to 54 pounds occasionally and 26.5 pounds frequently.

Elliott went to the emergency room on September 19, 1990, suffering from respiratory problems. He was diagnosed with asthmatic bronchitis. He returned to the emergency room with similar problems in December. Dr. Conger ordered a pulmonary function test, which indicated that Elliot had a small to medium airway obstruction that had increased since a test conducted in August. Dr. Conger recommended a sinus drainage procedure. In his recommendation report, dated April 20, 1992, Dr. Conger noted Elliot's chronic obstructive lung disease, which caused exertional dyspnea, or difficultly breathing. He also noted Elliott's chronic low back pain, which had not improved much since surgery. Dr. Conger noted that Elliott complained of a burning sensation in his chest, which Dr. Conger attributed to angina.

In August 1992, Elliott underwent a cardiac catheterization performed by Dr. Bruce Hettleman. Elliott underwent triple coronary artery bypass graft surgery on September 9, 1992. In a

10

follow-up examination in October, Elliott reported no anginal symptoms, but did complain of numbness and tingling in his chest, difficultly sleeping due to nightmares, and mild shortness of breath.

Elliott underwent cardiac stress tests in November 1992, September 1993, and November 1994. Each test was non-diagnostic due to Elliott's failure to reach the target heart rate due to fatigue or leg cramps caused by claudication.[5]

In a November 23, 1994, medical examination report to the New Hampshire disability determination agency, Dr. Conger noted that Elliott's lung condition was unchanged since 1990. He stated that the claudication would prevent Elliott from a job requiring walking; the lung disease would prevent Elliott from any job without repeated absences due to illness; and the back problems would prevent him from sitting or standing in a single position for prolonged periods of time. Dr. Conger assessed that Elliott was "totally and permanently disabled." (Tr. 346).

In medical interrogatories dated July 1995, Dr. Conger stated that he had treated Elliott since 1987. He stated that Elliott had been diagnosed with chronic obstructive pulmonary

---

[5] Pain, tension, and weakness in the legs due to walking; seen in occlusive arterial disease.

disease, arteriosclerotic heart disease, high blood pressure, lumbosacral disc disease, and peripheral vascular disease. He concluded that Elliott could sit or stand for an hour at a time for a total of five hours; stand and walk for an hour at a time for a total of five hours; lift 15 pounds occasionally and 10 pounds frequently; and carry a maximum of 10 pounds. He wrote that Elliott should avoid gases, fumes, dust, moisture, humidity and moving machinery, and that he should never bend, stoop, twist, crouch or kneel.

Elliott testified that he spends much of his time reading. (Tr. 68). His household chores consist of straightening up magazines and putting dishes in the dishwasher. (Tr. 62-3). He uses a snow blower for a half-hour at a time, but must wear a mask while doing so. (Tr. 63). He uses a nebulizer machine to aid his breathing, especially during the summer months. (Tr. 69-70). He can fish from a boat. (Tr. 67). He rarely goes out, but enjoys watching soccer games by alternating positions between a blanket and a chair. (Tr. 68-9). He testified that he has difficultly bathing his feet because he cannot easily bend or stoop. (Tr. 71). He used to keep a garden, but now has only a small flower garden that he tends by leaning on a special pad. (Tr. 72). He used to enjoy walks with his wife, but testified

12

that he no longer does because she has to wait for him while he rests. (Tr. 62).

Bruce Chipman,[6] a vocational rehabilitation counselor employed by Rehabilitation Services Associates of Henniker, N.H., testified that there were 2,575 jobs in New Hampshire and 770,000 in the nation that Elliott could perform. The jobs listed are all considered "light" jobs under SSA regulations. The ALJ specifically requested that the vocational expert calculate the numbers and types of light jobs and exclude any at the sedentary level. (Tr. 85). Chipman based his calculations on the job opportunities for a hypothetical worker, as described by the ALJ.

## II. **STANDARD OF REVIEW**

After a final determination by the Commissioner denying a claimant's application for benefits and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the Commissioner's decision. See 42 U.S.C.A. § 405(g). My review is limited in scope, however, as the Commissioner's

---

[6] The ALJ mistakenly refers to Mr. Chipman as "Mr. Bopp" throughout his decision.

factual findings are conclusive if they are supported by substantial evidence. See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); 42 U.S.C.A. § 405(g). The Commissioner is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, I must "'uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the Commissioner has misapplied the law or has failed to provide a fair hearing, however, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary. See Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Secretary of Health and Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) ("The [Commissioner's] conclusions of law are reviewable by this court.") I apply these standards in reviewing the issues Elliott raises on appeal.

14

## III.  DISCUSSION

### A.  Reopening of the 1992 denial of benefits

As a preliminary matter, the Commissioner argues that the doctrines of res judicata and collateral estoppel bar Elliott from proving his alleged disability existed on or before December 30, 1992, the date his previous application was denied. (Defendant's Motion for Order Affirming the Decision of the Commissioner, at 4.).  Because the ALJ explicitly refused to reopen the 1992 decision, the Commissioner claims, Elliott is bound by the prior determination.  Thus, Elliott must prove that he became disabled on December 31, 1992, the last date of his insured status and the only such date on which his condition was not previously adjudicated.  I disagree.

The district court has no jurisdiction to review an ALJ's refusal to reopen a prior decision absent a colorable constitutional claim.  See Torres v. Secretary of Health and Human Servs., 845 F.2d 1136, 1138 (1st Cir. 1988) (citing Califano v. Sanders, 430 U.S. 99, 107-09 (1977)).  Where an ALJ reopens a prior decision, however, the ALJ's final decision is subject to judicial review to the extent the prior decision has been reopened.  See Morin v. Secretary of Health and Human Servs., 835 F. Supp. 1414, 1422 (D. N.H. 1992).  An ALJ may consider evidence

from a prior case for the limited purpose of reviewing the facts and medical history to determine whether the claimant was disabled at the time of the second application. See Frustaglia v. Secretary of Health and Human Servs., 829 F.2d 192, 193 (1st Cir. 1987). An ALJ may also review the prior evidence to determine whether the second claim is the same as the first for res judicata purposes. See Torres, 845 F.2d at 1139. Where an ALJ reconsiders the prior evidence on the merits, however, the ALJ "constructively" reopens the prior decision and renders it subject to judicial review under the substantial evidence standard. See Jelinek v. Heckler, 764 F.2d 507, 508-09 (8th Cir. 1985); Morin, 835 F. Supp. at 1422; Malave v. Sullivan, 777 F. Supp. 247, 251 (S.D.N.Y. 1991). This is so even where the ALJ explicitly states his refusal to reopen the prior case. See Jelinek, 764 F.2d at 508-09; Malave, 777 F. Supp. at 251.

Here, although the ALJ explicitly refused to reopen the 1992 decision, his statements at the hearing coupled with his reconsideration of prior evidence on the merits indicate that he did, in fact, reopen the decision. The ALJ stated at the administrative hearing that he would base his decision on

> "all of the evidence as to whether Mr.
> Elliott is disabled at any time on or before
> December 31, 1992, as opposed to considering
> separately any issue about whether there was

> new and material evidence to disturb or to
> reopen what had ordinarily been final by the
> Administration back on December 30, 1992."

(Tr. 48). While questioning Elliott, he further stated that "we're looking very specifically at a period of time *before* 1992, December 31, 1992, to be exact." (Tr. 55, emphasis added).

While an ALJ is free to examine evidence relevant to a prior determination without actually reopening that case, here the ALJ not only examined the evidence but also rendered a decision on the merits based largely on that evidence.[7] Contra Frustaglia, 829 F.2d at 193. He cites to medical records and assessments from 1986, 1987, 1988, 1990, and 1992 -- all of which were relevant to the prior determination. Virtually the only subsequent evidence the ALJ cites in his decision is a 1994 medical examination report from Dr. Conger and medical inter-rogatories answered by Dr. Conger in 1995. The ALJ's reliance on

---

[7] It is true that, because there was only one day of insurance coverage which post-dates the 1992 decision, the bulk of evidence relating to Elliott's condition is the same in both the 1992 and the 1994 applications. In the absence of evidence relating specifically to December 31, 1992, the ALJ could have simply concluded that the claims were the same and applied res judicata to bar the second claim. See Torres, 845 F.2d at 1138. Doing so would have insulated the ALJ's decision not to reopen the prior case from judicial review. See id. Here, however, the ALJ clearly went beyond a mere reexamination of the evidence for res judicata purposes and reconsidered it on the merits. Contra id. at 1138-39.

17

these items is insufficient to support a finding that he did not reopen the prior decision for two reasons. First, the report and interrogatories are retrospective and relate to Elliott's condition on or before December 31, 1992. Second, the ALJ himself discredits Dr. Conger's 1994 opinion by noting that the letter was written "long after the date the claimant was last insured."

The only other subsequent evidence noted in the ALJ's decision is a 1995 residual functional assessment by Dr. Homer Lawrence, a physician certified by the state agency to review Elliott's case. Dr. Lawrence's assessment was merely a review of the evidence relevant to the 1992 determination. Furthermore, the ALJ places great reliance in his determination that Elliott can perform light work on a 1988 letter written by Dr. Savage, which, again, was relevant to the 1992 determination. Thus, I find that the ALJ constructively reopened the 1992 decision.

The question before me, therefore, is not whether the ALJ properly applied res judicata to preclude a finding of disability prior to December 31, 1992 -- as he did not. Rather, the question is whether there is substantial evidence to support a finding that Elliott was not disabled and could perform light work within the meaning of the Act at any time between November 17, 1986 and December 31, 1992.

**B. ALJ's review of Elliott's disability claim**

An ALJ is required to apply a five-step sequential analysis to determine whether a claimant is disabled within the meaning of the Act.[8] At step four, the ALJ must determine whether the claimant's impairments prevent him from performing his past work. See 20 C.F.R. § 404.1520(e). The ALJ must assess both the claimant's residual functional capacity ("RFC") -- i.e., what the claimant can do despite his impairments -- and the claimant's past work experience. See Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir. 1991). At step five, the burden shifts to the Commissioner to show that there is other work in the national economy that the claimant is capable of performing based on the claimant's RFC. See Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991); Keating v. Secretary

---

[8] The ALJ is required to consider the following five steps when determining if a claimant is disabled:
(1) whether the claimant is engaged in substantial gainful employment;
(2) whether the claimant has a severe impairment that lasted for twelve months or had a severe impairment for a period of twelve months in the past;
(3) whether the impairment meets or equals a listed impairment;
(4) whether the impairment prevents or prevented the claimant from performing past relevant work;
(5) whether the impairment prevents or prevented the claimant from doing any other work.
See 20 C.F.R. § 404.1520.

of Health and Human Servs., 848 F.2d 271, 276 (1st Cir. 1988). The Commissioner must show that the claimant's limitations do not prevent him from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating, 848 F.2d at 276 ("[t]he standard is not employability, but capacity to do the job").

Here, the ALJ concluded at the fourth step that Elliott could not return to his past work because it required medium and heavy labor. The ALJ also found that Elliott retained the ability to perform a limited range of light work. Relying on the testimony of a vocational expert ("VE"), the ALJ found, at step five, that there were a significant number of light duty jobs in the national economy which Elliott could perform. Thus, the ALJ found Elliott was not under a disability and denied his claim for benefits.

The Commissioner can meet his burden of proof at step five by posing hypothetical questions to a VE and relying on the VE's testimony. The VE's answer to a hypothetical question is not adequate, however, unless "the inputs into that hypothetical . . . correspond to conclusions that are supported by the outputs from the medical authorities." Arocho v. Secretary of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982); see also Rose v.

20

Shalala, 34 F.3d 13, 19 (1st Cir. 1994) (ALJ cannot rely on VE's testimony when hypothetical omits significant functional limitation). Elliott argues that the hypothetical posed to the VE did not adequately reflect his functional limitations and, therefore, the ALJ could not rely on the VE's testimony to determine Elliott was not disabled. For the reasons that follow, I agree and remand this case for further consideration at step five of the disability benefits review.

1. **<u>Medical evidence of Elliott's RFC</u>**

An ALJ must specify the basis for his conclusion that a claimant possesses a residual functional capacity to perform a certain level of work. See <u>White v. Secretary of Health and Human Servs.</u>, 910 F.2d 64, 65 (2d Cir. 1990). Failure to specify such a basis is grounds to vacate a decision. See <u>id.</u> Even where the ALJ does specify his reasons, the record must contain adequate evidence to support his finding. See <u>Rose</u>, 34 F.3d at 19; <u>Berrios Lopez v. Secretary of Health and Human Servs.</u>, 951 F.2d 427, 431 (1st Cir. 1991). Here, the ALJ appears to base his determination that Elliott could perform light work on three pieces of evidence: (1) Dr. Savage's 1998 letter; (2) Dr. Conger's 1995 medical interrogatories; and, (3) Dr. Lawrence's review of the medical record. After examining the entire record,

I find that this evidence, whether taken together or separately, is insufficient to support a determination that Elliott could perform light work as it is defined by SSA regulations.

First, the ALJ misconstrues Dr. Savage's letter. Dr. Savage stated that Elliott could return to work on a part-time basis and could perform "sedentary or light work." (Tr. 305). The ALJ fails to take note of the restrictions Dr. Savage set out in her letter. She stated that Elliott's work should include "no lifting or carrying of objects weighing over 10 pounds, rare lifting or carrying of objects of 10 pounds or less. No prolonged sitting or standing with the ability to change position at will." She further advised that Elliott should not use his arms, particularly his left arm, for repetitive activities. These restrictions would clearly bar Elliott from "light" work as it is defined by the SSA.[9]

By relying on Dr. Savage's quote in isolation, the ALJ also ignores Dr. Savage's September 1988 functional capacity assessment of Elliott, which supports the restrictions set out in her

---

[9] "Light" work is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §404.1567(b).

letter.  (Tr. 396-97).  Here, she noted that Elliott should never lift or carry more than 10 pounds, bend, squat, crawl, climb, or reach above his shoulders.  She noted that Elliott can walk for up to an hour a day and sit or stand for up to four hours a day, but neither for more than a few minutes at a time.  She added that Elliott should rarely, if ever, push or pull from a seated or standing position.

Dr. Lord, who operated on Elliott's back and treated him over a two-year period, made similar findings in functional capacity assessments dated March and September 1988.  (Tr. 394-95, 396-97).  In the latter, Dr. Lord wrote that he "agree[s] totally" with Dr. Savage's assessment of Elliott's capabilities.

Neither Dr. Savage nor Dr. Lord concluded that Elliott could perform light work without restrictions.  At most, this evidence would support a finding that Elliott could, as of September 1988,[10] perform sedentary work on a part-time basis.[11]

---

[10]  About 18 months after his initial injury.

[11]  "Sedentary" work is defined as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  20 C.F.R. §404.1567(a).

The ALJ also relies on Dr. Conger's 1995 interrogatories to determine that Elliott is capable of light work.  Dr. Conger's answers arguably support such a finding.  Elsewhere in the ALJ's decision, however, he discredits Dr. Conger's ability to assess Elliott's back condition because Dr. Conger did not treat Elliott's back condition.  He also discredits Dr. Conger's 1994 assessment as being too remote in time from the last date of Elliott's insured status.  Applying his own logic, the ALJ would have to likewise discount the 1995 interrogatories because Dr. Conger answered them a year after he made his medical assessment.

The only remaining evidence which would support the ALJ's determination is Dr. Lawrence's RFC assessment.  Dr. Lawrence did not examine Elliott, nor did he testify at the hearing.  A non-examining, non-testifying physician's report standing alone may, in some circumstances, constitute sufficient evidence to support an ALJ's RFC determination.  See Berrios Lopez, 951 F.2d at 431-32.  Such circumstances do not exist here.  Contra id. at 431-32 (evidence included two reports by non-examining doctors, one report included subsidiary medical findings, treating physician's report differed only slightly).  Where, as here, an assessment clearly conflicts with the opinions of the claimant's treating physicians, the assessment does not constitute substantial

24

evidence. See Rose, 34 F.3d at 19. While weighing the evidence is the ALJ's responsibility, SSA regulations direct the ALJ to give more weight to an examining physician than to a non-examining physician. See 20 C.F.R. § 404.1527(d)(1),(2); Morin, 835 F. Supp. at 1427. The ALJ recognized this where he explicitly chose to favor Dr. Savage's assessment of Elliott's back condition over Dr. Conger's. An ALJ is not required to accept a treating physician's conclusions of a claimant's disability. See Arroyo v. Secretary of Health and Human Servs., 932 F.2d 82, 89 (1st Cir. 1991). An ALJ may not, however, substitute his own judgment for uncontroverted medical evidence. See Rosado v. Secretary of Health and Human Servs., 807 F.2d 292, 293-94 (1st Cir. 1986). Here, the treating physicians do more than give mere conclusory statements about Elliott's condition. Rather, both Dr. Savage and Dr. Lord give detailed descriptions of Elliott's abilities and specific recommendations for appropriate work. Nothing in the record, with the exception of Dr. Lawrence's review, indicates that any doctor treating Elliott for his back condition disagreed with Drs. Lord and Savage in the fall of 1988. The ALJ gave no reason for dis-crediting Dr. Lord's assessment -- indeed, he does not even mention Dr. Lord in his decision. Nor does he give a reason for discrediting Dr.

25

Savage's opinion.  On the contrary, he claims to credit it and then goes on to misapply her recommendations to conclude Elliott can perform light work.  In the face of such overwhelming contradictory evidence, the ALJ could not rely on Dr. Lawrence's assessment as substantial evidence of Elliott's residual functional abilities.  See Rose, 34 F.3d at 19; contra Berrios Lopez, 951 F.2d at 431-32.

   2.   **ALJ's hypothetical question to VE**

Because there is no substantial evidence to support a finding that Elliott could perform light work, the ALJ's ultimate conclusion that there are numerous jobs in the national economy that Elliott could perform is also without support.  See Perez v. Secretary of Health and Human Servs., 958 F.2d 445, 447 (1st Cir. 1991).  The ALJ relied on testimony from the VE, who testified only as to the number of light jobs available in the nation and New Hampshire.  The VE based his calculations on a hypothetical claimant described by the ALJ.  Here, the ALJ's hypothetical question did not correspond to the medical evidence.  Thus, the ALJ could not properly rely on the VE's testimony.  See Rose, 34 F.3d at 19 (remand appropriate where ALJ's hypothetical failed to take note of medical evidence of claimant's symptoms); Arocho, 670 F.2d at 375 (remand for clarification of claimant's capa-

26

cities and availability of work appropriate where vocational expert based opinion on flawed hypothetical).

In his decision, the ALJ explicitly chose to credit Dr. Savage's assessment of Elliott's back condition; yet his hypothetical painted a portrait of a man who could perform work at a much higher exertional level than Dr. Savage recommended. The ALJ's hypothetical asked the VE to consider:

> "[S]omeone who is not going to be able to do that type of heavy lifting of more than 20 pounds, not being able to work in a job where they would have to be exposed to excessive amounts of dust and fumes and extremes of particularly temperature (sic) such as very cold weather or very hot, humid environments, and if we're dealing with someone who would be able to, perhaps, stand with the opportunity to occasionally change positions, perhaps in the morning, mid-morning with a mid-morning break, lunch time break, perhaps in the mid-afternoon as well."

(Tr. 84). The ALJ's hypothetical does not correspond to the medical evidence for two reasons. First, it clearly contemplates an individual who can work an eight-hour day. Second, it describes an individual who can perform work at the light exertional level.[12]

---

[12] Indeed, the ALJ explicitly told the VE to confine his answer to jobs at the light exertional level and to refrain from testifying as to sedentary jobs. (Tr. 85). The VE, responding to questions from Elliott's attorney, testified that the number of light jobs in his calculation would be reduced if the hypothe-

Nothing in the medical records before the ALJ indicated that Elliott could perform anything more than part-time work. Dr. Lord's March 1988 assessment predicted that Elliott could return to part-time work, for three to four hours a day, the following July. Dr. Savage's 1988 letter and RFC assessment state that Elliott could work only four hours a day. Dr. Lord's September 1988 assessment states that he concurred completely with Dr. Savage. Cioffredi's 1988 discharge note states that Elliott is capable of "limited periods" of work. (Tr. 292). Smith-Blais' 1990 functional capacity report was based on Elliott's abilities during a three- to four-hour work day. (Tr. 400).

Furthermore, the hypothetical described an individual who could lift and carry at the light exertional level (a maximum of 20 pounds), while the medical evidence in the record -- most notably Dr. Savage's 1988 letter and functional capacity assessment -- states that he should lift and carry no more than 10 pounds. Dr. Lord's RFC assessments similarly state that Elliott should never lift or carry more than 10 pounds. Dr.

---

tical worker could lift no more than 10 pounds. (Tr. 89). The VE was unable to testify as to the number of jobs available for a person with a 10-pound lifting restriction, stating "that would be a separate set of figures under the sedentary." Id. The ALJ did not further question the VE, revise his hypothetical, or ask the VE to provide figures for sedentary jobs.

28

Conger's 1995 interrogatories state that Elliott could lift a maximum of 15 pounds and carry a maximum of 10 pounds. (Tr. 368-69).

Because the ALJ's hypothetical did not accurately portray Elliott's functional capabilities, he could not reasonably rely on the VE's testimony. See Arocho, 670 F.2d at 375. Therefore, the Commissioner did not meet his step-five burden of proving there is other work in the national economy that Elliott can perform. See Heggarty, 947 F.2d at 995. Consequently, this case must be remanded to allow the ALJ to properly analyze Elliott's claim at step five of the disability benefits review. See Arocho, 670 F.2d at 375.

## IV. CONCLUSION

For the foregoing reasons, Elliott's motion for an order reversing the Commissioner's decision (document no. 7) is granted, and the Commissioner's motion for an order affirming his decision (document no. 9) is denied. Pursuant to 42 U.S.C.A. § 405(g), this case is remanded to the Commissioner for further consideration consistent with this order.

29

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

September 29, 1998

cc:  Maria L. Sozio, Esq.
     David L. Broderick, AUSA